Filed 3/4/13

# IN THE SUPREME COURT OF CALIFORNIA

In re MICHAEL D. VICKS  )
    )
on Habeas Corpus.  )    S194129
    )
    )    Ct.App. 4/1 D056998
    )
    )    San Diego County
    )    Super. Ct. No. CR63419
_____ )

In 2008, California voters approved Proposition 9, the Victims' Bill of Rights Act of 2008: Marsy's Law. The changes enacted by Marsy's Law became effective immediately; pertinent here are the amendments to Penal Code[1] section 3041.5 that increase the period of time between parole hearings but allow for the advancement of a hearing if a change in circumstances or new information subsequently establishes that there is a reasonable probability the prisoner is suitable for parole. Petitioner Michael D. Vicks (Vicks) contends that application of these new parole procedures to prisoners who committed their crimes prior to the enactment of Marsy's Law violates the ex post facto clauses of the federal and state Constitutions. (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) He challenges the amendments both on their face and as applied to him. For the reasons set forth below, we reject both of his challenges.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

# I. FACTS

## A. The Underlying Crimes

In 1983, Vicks was convicted of numerous violent felonies and sentenced to life in prison with the possibility of parole, consecutive to a determinate term of 37 years eight months.[2] According to the appellate opinion affirming the judgment, which the Board of Parole Hearings (Board) referenced during the parole hearing, Vicks and his accomplice engaged in two crime sprees in April 1983. They confronted their first victim as she was putting groceries into her car in a parking lot. Vicks drove the victim's car, with the victim inside, to a second parking lot where he blocked a parked car. Vicks's accomplice put a gun to the side of one of two women who were entering the parked car and took both women's purses. The accomplice then drove the first victim's car to a third parking lot and blocked another parked car. Vicks got out, pointed a gun at the driver of the parked car, and demanded his wallet and money. Vicks then approached the passengers, a woman and her six-year-old son, put a gun to the woman's ribs, and ordered her into the first victim's car. The woman pushed her son into her own car and got into the first victim's car. After driving for a few minutes, the accomplice stopped the car. The two women, whose heads were

---

[2] Petitioner was convicted of one count of kidnapping for purposes of robbery while personally using a firearm (§§ 209, subd. (b), 12022.5; six counts of robbery while armed with a firearm (§§ 211, 12022, subd. (a)); two counts of rape in concert while armed with a firearm (§§ 261, subd. (a)(2), 264.1, 12022.3, subd. (b); two counts of oral copulation in concert while armed with a firearm (§§ 288a, subd. (d), 12022.3, subd. (b)); one count of kidnapping while personally using a firearm (§§ 207, 12022.5); one count of attempted robbery while personally using a firearm (§§ 211, 664, 12022.5); one count of robbery while personally using a firearm (§§ 211, 12022.5); two counts of kidnapping while armed with a firearm (§§ 207, 12022, subd. (a)).

covered, were led into a canyon area, where they were separated. Vicks, his accomplice, and a third man were present. The women were repeatedly sexually assaulted. The three men then ran away.

Less than two weeks later, Vicks and his accomplice forced two women at gunpoint into a car belonging to one of the women, then blocked a third woman's car and stole the third woman's purse. After they drove away, the accomplice placed the hand of one of the women on his erect penis. The two women then fought their way out of the car, hitting the accomplice in the head with his gun during the fight, and leaving their purses behind. That evening, Vicks and his accomplice went to Vicks's cousin's apartment. The cousin saw the two looking through women's purses and removing money from them. The accomplice, whose head was bleeding, said that he and Vicks "had just gotten into a crazy incident." The accomplice told Vicks's cousin that he had asked one of the women to orally copulate him, and described a fight that ended with the women's escape. The cousin drove Vicks and his accomplice onto a freeway where Vicks threw the purses out of the car. When the purses were returned by the police to the victims, one purse contained a paper with the name of Vicks's cousin on it. The cousin informed the police that Vicks and the accomplice brought the purses to the cousin's house after the women had jumped out of the car nearby.

**B. Parole Hearing**

Vicks began serving his life term on March 13, 2003. His minimum eligible parole date was March 14, 2010, and his initial parole suitability hearing was held on February 3, 2009. Applying section 3041.5 as amended by Marsy's Law in 2008, the Board found him unsuitable for parole, and further concluded that he should be denied another parole hearing for five years.

3

In announcing the Board's decision, the presiding commissioner noted that Vicks's offenses involved "a series of horrific crimes that happened over a very short period. Your position is that it wasn't you and you did not participate in that, other than finding several of the victim's purses and failing to turn them in."[3] The commissioner noted that the Board accepts the facts found in the criminal prosecution, and observed that "[t]hese are the kinds of crimes that psychologically last a lifetime . . . ." He added that "the offense was carried out dispassionately and certainly there was a level of calculation to the execution . . . . The offense was carried out in a manner that demonstrates disregard for human suffering and the motive was apparently self-gratification and financial gratification as well." The commissioner stated that Vicks's prior criminal history "did not weigh heavily into our decision, because it was frankly a long time ago and most of the issues were nonviolent . . . ." He also stated that "you've done a marvelous job on yourself," and "[y]ou have remained in a very good status with regard to your disciplines . . . ." He explained that "[o]ur biggest concern with you, sir, is your level of insight, it's difficult for us to measure that when you've been convicted and it is a horrific crime in nature and you find yourself not coming to grips in any way, shape or form with that, other than you found yourself in possession of purses." He added that individuals sometimes have difficulty

---

[3] In a statement petitioner prepared for the hearing, he stated that he "made a very irresponsible and life altering decision when I came in possession of purses belonging to [three victims]," but he "reiterate[d] that I am totally and unequivocally innocent of the crimes for which I was found guilty . . . ." (See § 5011, subd. (b) ["The Board . . . shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed"]; Cal. Code Regs., tit. 15, § 2281, subd. (b) [among the information considered in determining suitability for parole is "past and present attitude toward the crime"].)

4

coming to grips with the kinds of crimes Vicks committed, and that "[i]f that's what your struggle is, we wish you well, sir." The commissioner also stated that Vicks needed to reduce some of the ratings in his psychological evaluation.[4] Finally, with respect to the date of Vicks's next parole suitability hearing, the presiding commissioner stated that the commissioners "discussed at length what we thought would be appropriate and at this point we have reached a conclusion that a five-year denial is the appropriate denial . . . ."

Vicks challenged the decision by filing a petition for writ of habeas corpus in San Diego County Superior Court, which the superior court denied on December 10, 2009.

Vicks then filed a petition for writ of habeas corpus in the Court of Appeal. On May 11, 2011, following issuance of an order to show cause and briefing, the Court of Appeal, with one justice dissenting, filed an opinion vacating the Board's order to the extent the order deferred Vicks's subsequent parole suitability hearing for five years. The majority concluded that the changes enacted by Marsy's Law to the scheme for setting parole hearings violate ex post facto principles as applied to prisoners who committed their crimes prior to the enactment of Marsy's Law. It directed the Board to issue a new order scheduling the hearing in accordance with the provisions of section 3041.5 in effect in 1983, which generally entitled a prisoner to an annual parole hearing but allowed deferrals of no more than three years in specified circumstances.

---

[4] The psychological evaluation prepared for the parole hearing concluded that "[t]he combined weight of the various points of data indicates that the inmate poses a Medium-Low risk for Sexual Recidivism and a Low to Moderate risk of violence for general recidivism in the community."

We granted review to address whether section 3041.5, as amended by Marsy's Law, may be applied to life inmates convicted before the effective date of the amendments without violating the ex post facto clauses of the state and federal Constitutions.

## II. DISCUSSION

### A. Marsy's Law

#### 1. Overview of Marsy's Law

Marsy's Law, which was enacted by the voters in November 2008, was named after a young woman who was murdered in 1983. (Prop. 9, reprinted at Historical Notes, 1E West's Ann. Cal. Const. (2012) foll. art. I, § 28, p. 9.) According to the measure's uncodified findings and declarations (Prop. 9, Findings), following the arrest of Marsy's murderer, "Marsy's mother was shocked to meet him at a local supermarket" after he was released on bail without Marcy's family's receiving notice or opportunity to express opposition to his release. (*Id*., ¶ 7.) "Several years after his conviction and sentence to 'life in prison,' the parole hearings for his release began. In the first parole hearing, Marsy's mother suffered a heart attack fighting against his release. Since then Marsy's family has endured the trauma of frequent parole hearings and constant anxiety that Marsy's killer would be released." (*Id*., ¶ 8.) The law was "written on behalf of [Marsy's family], who were often treated as though they had no rights, and inspired by hundreds of thousands of victims of crime who have experienced the additional pain and frustration of a criminal justice system that too often fails to afford victims even the most basic of rights." (*Id*., ¶ 2.)

The measure's findings express a number of grievances, including the failure to build adequate prisons and jails, the early release of inmates "after serving as little as 10 percent of the sentences imposed" (Prop. 9, Findings, ¶ 4,

6

West's Ann. Cal. Const., *supra*, at p. 9), the pain caused victims' families by frequent parole hearings, the failure of the criminal justice system to give victims "notice of important hearings in the prosecutions of their criminal wrongdoers, failure to provide them with an opportunity to speak and participate, failure to impose actual and just punishment upon their wrongdoers, and failure to extend to them some measure of finality to the trauma inflicted upon them by their wrongdoers." (*Id.*, ¶ 9; see *id.*, ¶ 5.) Among the measure's stated purposes are to "[p]rovide victims with rights to justice and due process" (Prop. 9 , § 3, ¶ 1 (Prop. 9, Purposes)), and to "eliminat[e] parole hearings in which there is no likelihood a murderer will be paroled . . . ." (*Id.*, ¶ 2.) According to the measure, " 'Helter Skelter' inmates Bruce Davis and Leslie Van Houghton, two followers of Charles Manson convicted of multiple brutal murders, have had 38 parole hearings during the past 30 years." (Prop. 9, Findings, ¶ 6.)

Marsy's Law includes both constitutional and statutory amendments. The constitutional provisions recognize various rights of victims of crime and of the people of California, including the right to expect that crimes will be thoroughly investigated, and that criminals will be tried in a timely manner and "sufficiently punished in both the manner and the length of the sentences imposed." (Cal. Const., art. I, § 28, subd. (a)(5); see *id.*, subd. (a)(4).) The provisions also state that "[l]engthy appeals and other post-judgment proceedings that challenge criminal convictions, frequent and difficult parole hearings that threaten to release criminal offenders, and the ongoing threat that the sentences of criminal wrongdoers will be reduced, prolong the suffering of crime victims for many years after the crimes themselves have been perpetrated." (*Id.*, subd. (a)(6).) The provisions recognize a right of crime victims to notice of and to be present at "all public proceedings . . . at which the defendant and the prosecutor are entitled to be present and of all parole or other post-conviction release proceedings . . . ." (*Id.*,

7

subd. (b)(7).)  They afford a right "[t]o be heard . . . at any proceeding . . . involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue."  (*Id*., subd. (b)(8).)  They also entitle victims to provide and receive information related to sentencing of a defendant.  (*Id*., subd. (b)(10), (11).)  With respect to parole, the provisions afford victims the right "[t]o be informed of all parole procedures, to participate in the parole process, to provide information to the parole authority to be considered before the parole of the offender, and to be notified . . . of the parole or other release of the offender."  (*Id*., subd. (b)(15.)

Most of the law's statutory amendments relate to parole.  As described more fully below, Marsy's Law amended section 3041.5 to increase the time between parole hearings, absent a finding by the Board that an earlier hearing is appropriate.  It also amended section 3042 to expand the rights of victims to present information to the Board, and to require the Board to consider the "entire and uninterrupted" statements of victims, their families and their representatives.  (§ 3043, subd. (d).)  It added section 3044, which specifies that in the event a parolee's parole is revoked, the parolee shall not be entitled to any procedural rights other than those specified in that section.  Finally, it added section 679.026, which requires law enforcement agencies to take specified steps to inform crime victims of their rights under Marsy's Law.

*2. Amendments to section 3041.5 affecting the time within which*
*Vicks's parole hearing must be held*

In 1983, at the time Vicks committed the crimes for which he is incarcerated, section 3041.5 required the Board of Prison Terms[5] to provide annual parole hearings following the initial hearing, except that a hearing could be deferred for (1) up to two years "if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding," or (2) up to three years "if the prisoner has been convicted . . . of more than one offense which involves the taking of a life, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding." (§ 3041.5, subd. (b)(2), as amended by Stats. 1982, ch. 1435, § 1, p. 5474.) Thus, at the time Vicks committed his crimes, he was entitled to an annual parole hearing unless the Board found that it was not reasonable to expect that he would be granted parole in a year, in which case his parole hearing could be deferred for up to two years.

As amended in 2008 by Marsy's Law, section 3041.5 establishes longer deferral periods following the denial of parole than did the statute in 1983.[6] The

---

[5]    The Board of Prison Terms was abolished and replaced by the Board of Parole Hearings, effective July 1, 2005. (§ 5075; Gov. Code, § 12838.4; we use the term "Board" to refer to both entities.)

[6]    In 1990, section 3041.5 was amended to authorize a deferral of three years "if the prisoner has been convicted . . . of more than one offense which involves the taking of a life," and five years "if the prisoner has been convicted . . . of more than two murders . . . ." (§ 3041.5, former subd. (b)(2)(B), (C); Stats. 1990, ch. 1053, § 1, pp. 4380-4381.) To defer for three or five years, the Board was required to find that it was not reasonable to expect that parole would be granted at a hearing in the interim period, and to state the bases for the finding in writing. Also, in the event of a five-year deferral, "the prisoner's central file shall be reviewed by a deputy commissioner within three years at which time the deputy commissioner may direct that a hearing be held within one year." (§ 3041.5,

*(Footnote continued on next page.)*

deferral periods range from a default period of 15 years to a minimum of three years. More specifically, the next hearing is to occur in 15 years, "unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates . . . are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than 10 additional years." (§ 3041.5, subd. (b)(3)(A).) If the Board makes such a finding, the next hearing shall be in 10 years, unless the Board finds, again by clear and convincing evidence and considering the same criteria and considerations, that a period of more than seven years is not required. (§ 3041.5, subd. (b)(3)(B).) In that event, the next hearing shall be in three, five, or seven years. (§ 3041.5, subd. (b)(3)(C).) The Board is required to "consider[] the views and interests of the victim" before selecting the appropriate deferral period. (§ 3041.5, subd. (b)(3).)

Although the amendments mandate longer deferral periods after the Board declines to set a parole date, they also give the Board discretion to advance the date of the next parole suitability hearing "when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner provided" by the statutory deferral periods. (§ 3041.5, subd. (b)(4).) In addition, "[a]n inmate may request that the board exercise its discretion to advance

_____

*(Footnote continued from previous page.)*

former subd. (b)(2)(C); Stats. 1990, ch. 1053, § 1, p. 4381.) In 1994, the provision concerning five-year deferrals was amended to apply to any prisoner convicted of murder. In addition, the statute was amended to require the Board to "adopt procedures that relate to the criteria for setting the hearing between two and five years." (§ 3041.5, former subd. (b)(2)(B); Stats. 1994, ch. 560, § 1, pp. 2833-2834.)

a hearing . . . to an earlier date, by submitting a written request to the board, with notice, upon request, and a copy to the victim which shall set forth the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration of the inmate." (§ 3041.5, subd. (d)(1).) The Board may summarily deny a petition to advance if the petition does not comply with these requirements, or if, in the judgment of the Board, the change in circumstances or new information is insufficient to justify the Board's exercising its discretion under subdivision (b)(4). (§ 3041.5, subd. (d)(2).) Section 3041.5 does not expressly address what other actions the Board may take in response to a written request, but if the petition sets forth a "change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration of the inmate," the Board has authority under subdivision (b)(4) to hold a parole suitability hearing at an earlier date than was set when parole was previously denied.

Section 3041.5 provides that "[a]n inmate may make only one written request [to advance a hearing] during each three-year period." (§ 3041.5, subd. (d)(3).) The three-year period is calculated from one of two start dates: "Following either [1] a summary denial of [an inmate's] request . . . or [2] the decision of the board after a hearing described in subdivision (a) to not set a parole date, the inmate shall not be entitled to submit another request for a hearing pursuant to subdivision (a) until a three-year period of time has elapsed from the summary denial or decision of the board." (§ 3041.5, subd. (d)(3).)

The Court of Appeal interpreted this timing provision "to set a three-year 'blackout' period for an inmate to trigger the advanced hearings safeguard, because that section states that '[f]ollowing *either* a summary denial of a request made pursuant to paragraph [(d)(1)], *or the decision of the board after a hearing*

11

*described in* [*section 3041.5, subdivision (a)*] *to not set a parole date,* the inmate shall not be entitled to submit another request for a hearing pursuant to [section 3041.5, subdivision (a)] until a three-year period of time has elapsed from the summary denial *or decision of the board.*' (§ 3041.5, subd. (d)(3), italics added.) Because a regularly scheduled parole suitability hearing results (as it did here) in a 'decision of the board after a hearing described in [section 3041.5, subdivision (a)] to not set a parole date,' the statute appears to impose a three-year blackout period for an inmate to petition for an advanced hearing when parole is denied following a regularly scheduled suitability hearing."

We disagree with this interpretation, and conclude that section 3041.5, subdivision (d) does not prohibit an inmate from making a written request to advance a parole suitability hearing within three years after a regularly scheduled hearing at which parole is denied.[7]  As noted above, if a written request complies with the statutory requirements and sets forth a "change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration of the inmate" (§ 3041.5, subd. (d)(1)), the Board presumably will hold a parole suitability hearing at an earlier date than was set when parole was previously denied.  Thus, there are two possible outcomes of a written request — denial of the request or an earlier parole hearing.  If the request is denied, the inmate may not make *another* request for three years.  Similarly, if the Board holds an earlier parole suitability

---

**7**      Vicks relies in part on the initiative measure's Purposes, which identify a purpose "to provide that a convicted murderer can receive a parole hearing no more frequently than every three years." (Prop. 9, Purposes, ¶ 2, West's Ann. Cal. Const., *supra*, at p. 9.)  This statement is a general description of the measure, and does not prevail over the substantive terms of section 3041.5.

12

hearing — "a hearing described in subdivision (a)" — rather than denying the request, and it declines to set a parole date after the hearing, the inmate may not make *another* request for three years after this more recent decision of the Board. (§ 3041.5, subd. (d)(3).) In light of the reference to "another" request, it appears that subdivision (d)(3) calculates the three-year period from the date on which a request for an earlier hearing is finally resolved, i.e., from (1) the date of the summary denial or (2) the date of the *advanced* hearing at which the setting of a parole date is again denied. Therefore, a prisoner may make his or her first request for a new hearing at any time following the denial of parole at a regularly scheduled hearing, and then may make another request every three years.[8]

---

[8] The Board has also interpreted this timing provision to allow the first request to be made at any time. In its Administrative Directive No. 09/01, the Board states that the provision "allows the inmate to make one request for an advanced hearing date during each three year period, regardless of the denial length. If the request is granted and the inmate receives a denial at the advanced hearing, or if the request is summarily denied, the inmate cannot submit another request for an advanced hearing until a three-year period of time has elapsed from either the date of the summary denial or the advanced hearing[.]" (<http://www.cdcr.ca.gov/BOPH/docs/AD%2009-01.pdf.> [as of Mar. 4, 2013].) Similarly, the form the Board has made available to prisoners to petition to advance a hearing date states: "You can make one initial request for an advanced hearing date following a denial of parole at any time, but from then on you can only submit requests every three years." (Bd. Parole Hearings, Petition to Advance Hearing Date, p. 1 <http://www.cdcr.ca.gov/BOPH/docs/BPH_1045(A)-Petition_to_Advance_Hearing_Date.pdf. > [as of Mar. 4, 2013] (Petition); see *Garner v. Jones* (2000) 529 U.S. 244, 256 (*Garner*) ["Absent a demonstration to the contrary, we presume the Board follows its statutory commands and internal policies in fulfilling its obligations"]; *Good Samaritan Hospital v. Shalala* (1993) 508 U.S. 402, 414 ["Confronted with an ambiguous statutory provision, we generally will defer to a permissible interpretation espoused by the agency entrusted with its implementation"]; *Yamaha Corp of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 ["An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts"].)

*(Footnote continued on next page.)*

**B. Prohibition on ex post facto laws**

The United States Constitution states: "No state shall . . . pass any . . . ex post facto law . . . ." (U.S. Const., art. I, § 10, cl. 1.) The California Constitution also provides that an "ex post facto law . . . may not be passed." (Cal. Const., art. I, § 9.) Our California provision provides the same protections and is analyzed in the same manner as the federal provision. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 640, fn. 6 (*Rosenkrantz*).) Therefore, we may look to federal law in analyzing Vicks's challenge under both the federal and state provisions concerning ex post facto laws.

The purpose of the ex post facto doctrine is to ensure fair notice of the conduct that constitutes a crime and of the punishment that may be imposed for a crime. (*Rosenkrantz, supra*, 29 Cal.4th at p. 638.)[9] Therefore, it is "aimed at laws

---

*(Footnote continued from previous page.)*

Based on our interpretation of section 3041.5, subdivision (d)(3) as calculating the three-year period from the date of the denial of the request to advance or the denial of parole at an *advanced* hearing, and consistent with the Board's statements that (1) a prisoner must wait "until a three-year period of time has elapsed from either the date of the summary denial or the advanced hearing" and (2) he or she may subsequently submit requests every three years, a prisoner may file another request three years later, regardless of whether a regularly scheduled hearing has occurred in the meantime. For example, if a prisoner whose next hearing is deferred for three years unsuccessfully petitions after two years to advance the hearing, the prisoner will have the regularly scheduled hearing a year later, and, if parole is denied, will be entitled to petition to advance the next hearing two years later (three years after the summary denial of the earlier petition).

[9] The purpose and scope of the ex post facto clause are described more fully in our opinion in *Rosenkrantz, supra*, 29 Cal.4th at pages 638 through 640, which found no violation of ex post facto principles where the Governor reversed the Board's grant of parole to a prisoner who had committed his crime before the enactment of the Governor's authority to reverse the Board's decision. (*Id.* at pp. 651-652.)

14

that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' [Citations.]" (*California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 504 (*Morales*).) "Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of [the prohibition on retroactive increases in punishment]. [Citations.] Whether retroactive application of a particular change in parole law respects the prohibition on *ex post facto* legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account." (*Garner, supra,* 529 U.S. at p. 250.)

Two United States Supreme Court opinions are particularly pertinent to our inquiry — *Morales,* which considered California's 1981 increase in the potential deferral period between parole suitability hearings, and *Garner,* which reviewed Georgia's increase in its potential deferral period. In each case, the court identified the controlling inquiry as "whether retroactive application of the change . . . created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.' " (*Garner, supra*, 529 U.S. at p. 250, quoting *Morales, supra*, 514 U.S. at p. 509.) As discussed below, however, the high court undertook somewhat different approaches in the two cases in evaluating whether the change created a sufficient risk of increasing a prisoner's period of incarceration. The analysis in *Morales* focused on details of California's 1981 amendment demonstrating that the change was unlikely to result in longer incarceration. In contrast, *Garner* focused on the broad discretion held by Georgia's parole board, a power that includes the authority "to change and adapt based on experience." (*Garner, supra*, 529 U.S. at p. 253.)

We begin with *Morales, supra*, 514 U.S. 499. Prior to the 1981 amendment considered in *Morales*, a prisoner who was denied parole at his or her first parole suitability hearing was entitled to a subsequent suitability hearing annually. The 1981 amendment "authorized the Board to defer subsequent suitability hearings

15

for up to three years if the prisoner has been convicted of 'more than one offense which involves the taking of a life' and if the Board 'finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding.' [Citation.]" (*Id.* at p. 503.)

The high court began its analysis by rejecting the prisoner's reliance on three cases in which a violation of the ex post facto clause was found: *Lindsey v. Washington* (1937) 301 U.S. 397, which addressed a law that altered the sentence for the defendant's crime from "not more than fifteen years" to a sentence of 15 years; *Miller v. Florida* (1987) 482 U.S. 423, which addressed an increase in the presumptive sentencing range; and *Weaver v. Graham* (1981) 450 U.S. 24, which addressed a reduction in the credit prisoners earned toward their time served through good behavior in prison. "In contrast to the laws at issue in *Lindsey*, *Weaver*, and *Miller* (which had the purpose and effect of enhancing the range of available prison terms, [citation]), the evident focus of the California amendment was merely ' "to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings" ' for prisoners who have no reasonable chance of being released. [Citation.] Rather than changing the sentencing range applicable to covered crimes, the 1981 amendment simply 'alters the method to be followed' in fixing a parole release date under identical substantive standards. [Citations.]" (*Morales, supra*, 514 U.S. at pp. 507-508.)

The high court also rejected the view that "any legislative change that has any conceivable risk of affecting a prisoner's punishment" should be held to violate the ex post facto clause. (*Morales, supra*, 514 U.S. at p. 508.) "Under respondent's approach, the judiciary would be charged under the *Ex Post Facto* Clause with the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures . . . ." (*Ibid.*) Instead, "the question of what legislative adjustments 'will be held to be of sufficient moment to transgress the

constitutional prohibition' *must* be a matter of 'degree.' [Citation.] In evaluating the constitutionality [of a change], we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." (*Id*. at p. 509.)

The court concluded the Board's new authority to defer hearings created only a speculative possibility of increasing a prisoner's punishment. "First, the amendment applies only to a class of prisoners for whom the likelihood of release on parole is quite remote" (*Morales, supra,* 514 U.S. at p. 510), prisoners who had been convicted of "more than one offense which involves the taking of a life." (§ 3041.5, former subd. (b)(2); Stats. 1981, ch. 1111, § 4, p. 4339.) In support of its conclusion, it cited statistics from our opinion in *In re Jackson* (1985) 39 Cal.3d 464, 473, that "90% of *all* prisoners are found unsuitable for parole at the initial hearing, while 85% are found unsuitable at the second and subsequent hearings. [Citation.] In light of these numbers, the amendment 'was seen as a means "to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released." ' [Citation.]"[10] (*Morales, supra*, 514 U.S. at p. 511.)

---

**10** In *In re Jackson, supra*, 39 Cal.3d 464, we addressed a 1982 amendment to section 3041.5 that authorized the Board in all cases, not only those involving the taking of a life, to defer the next parole hearing for up to two years if the Board found it was not reasonable to expect that parole would be granted in a year. (Stats. 1982, ch. 1435, § 1, p. 5474.) We held that the amendment was "a procedural change outside the purview of the ex post facto clause" (*Jackson, supra*, 39 Cal.3d at p. 472) because it did not alter the criteria related to parole suitability or release on parole, and it "did not entirely deprive an inmate of the right to a parole suitability hearing." (*Id*. at p. 473.) We acknowledged that the change in the frequency of hearings "did eliminate the possibility that a parole date would be set within the period of the postponement. However, the likelihood that the postponement actually delays release on parole until after the next parole hearing appears slight." (*Ibid.*) In support of this conclusion, we cited legislative

*(Footnote continued on next page.)*

Second, the amendment was carefully tailored to the purpose of reducing the number of futile hearings. The timing of the initial parole suitability hearing remained the same; only after the Board had concluded at a parole hearing that (1) the prisoner was not suitable for parole and (2) it was not reasonable to expect that the prisoner would be suitable for parole in a year would the timing of a prisoner's hearings be affected. In addition, the Board was required to conduct a full hearing and state the bases of its finding, and there appeared to the high court to be an opportunity for an administrative appeal. "Moreover, the Board retains the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner." (*Morales, supra,* 514 U.S. at p. 511.) The court concluded: "In light of the particularized findings required under the

---

*(Footnote continued from previous page.)*

committee analyses that set forth statistics, noted in *Morales, supra*, 514 U.S. 499, concerning the percentage of prisoners found suitable for parole. We explained that "[i]n view of these statistics, the 1982 amendment was seen as a means 'to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released.' [Citation.]" (*Jackson, supra*, 39 Cal.3d at p. 473.) We also concluded, based on petitions we had received from prisoners who had been found suitable for parole, that "the periods between the date of the suitability finding and the proposed release date vary from three and one-half to nineteen years" (*id*. at p. 474), because a prisoner may be found suitable for parole before he or she has served the minimum period required by law. (See *post*, pp. 29-31.) This period between the finding of suitability and release "reinforce[d] the conclusion that the 'practical effect' of a hearing postponement is not significant." (*Ibid*.)

  *Jackson*'s analysis — whether the change is "procedural" — is no longer dispositive of the issue of whether a change violates ex post facto principles. (See *Collins v. Youngblood* (1990) 497 U.S. 37, 46 ["by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* clause"]; *Rosenkrantz, supra*, 29 Cal.4th at p. 651, fn. 9 ["*Collins* did not suggest that the circumstance that a change is procedural rather than substantive has no bearing on the ex post facto question"].)

18

amendment and the broad discretion given to the Board, the narrow class of prisoners covered by the amendment cannot reasonably expect that their prospects for early release on parole would be enhanced by the opportunity of annual hearings." (*Id.* at p. 512.)

In response to the contention that there was a possibility a prisoner would have a change in circumstances that would render him or her suitable for parole earlier than the scheduled hearing, the court stated that Morales had failed "to provide any support for his speculation that the multiple murderers and other prisoners subject to the amendment might experience an unanticipated change that is sufficiently monumental to alter their suitability for release on parole." (*Morales, supra*, 514 U.S. at p. 512.) Assuming a prisoner might experience such a change, the court found no basis in the record "for concluding that [such] a prisoner . . . would be precluded from seeking an expedited hearing from the Board." (*Ibid.*) On the contrary, this court had suggested in *In re Jackson, supra*, 39 Cal.3d at page 475, that the Board had discretion to advance a hearing, and the brief of the California Department of Corrections in *Morales* informed the high court that "the Board's 'practice' is to 'review for merit any communication from an inmate asking for an earlier suitability hearing.' " (*Morales, supra*, at p. 512.) The court concluded that "[a]n expedited hearing by the Board . . . would remove any possibility of harm even under the hypothetical circumstances suggested by [Morales]." (*Id.* at p. 513.)

Finally, the court concluded that "[e]ven if a prisoner were denied an expedited hearing, there is no reason to think that such postponement would extend any prisoner's actual period of confinement." (*Morales, supra*, 514 U.S. at p. 513.) In support of its conclusion, the court cited our explanation in *In re Jackson, supra*, 39 Cal.3d at page 474, that a finding of suitability for parole rarely leads to a prisoner's immediate release, and may be followed by years of

19

incarceration until the prisoner serves the minimum period of incarceration required by law. If a prisoner becomes suitable for parole before the next regularly scheduled hearing, "the Board retains the discretion to expedite the release date of such a prisoner. Thus, a prisoner who could show that he was 'suitable' for parole two years prior to such a finding by the Board might well be entitled to secure a release date that reflects that fact. Such a prisoner's ultimate date of release would be entirely unaffected by the change in the timing of suitability hearings." (*Morales, supra*, at p. 513.)

The high court next addressed the validity of an increase in the period between parole hearings in *Garner, supra*, 529 U.S. 244. *Garner* involved a prisoner's challenge to a change in Georgia's parole law that allowed that state's parole board to increase the period of time between parole hearings. At the time the prisoner committed his most recent offense, he was entitled to a parole hearing every three years after his initial denial of parole. Thereafter, the law was changed to require a hearing " 'at least every eight years' " after the initial denial. (*Id*. at p. 247.)

The court began its analysis by noting several principles it had recognized in *Morales, supra*, 514 U.S. 499. "[N]ot every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited. [Citation.] The question is 'a matter of "degree." ' [Citation.] The controlling inquiry, we determined, was whether retroactive application of the change in California law created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.' [Citation.]" (*Garner, supra*, 529 U.S. at p. 250.) The court acknowledged the numerous factors it had identified in support of its conclusion in *Morales* that California's decrease in the frequency of parole hearings did not violate the ex post facto clause, but it rejected the prisoner's focus on the differences between Georgia's amended parole law and the

20

California law reviewed in *Morales,* such as Georgia's longer potential deferral and the application of Georgia's amendment to all prisoners serving life sentences. "These differences are not dispositive. The question is whether the amended Georgia Rule creates a significant risk of prolonging respondent's incarceration." (*Garner, supra*, 529 U.S. at p. 251.) The court reiterated that "the *Ex Post Facto* Clause should not be employed for 'the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures.' [Citation.] These remain important concerns. The States must have due flexibility in formulating parole procedures and addressing problems associated with confinement and release." (*Id*. at p. 252.)

The court observed that "[t]he case turns on the operation of the amendment . . . within the whole context of Georgia's parole system." (*Garner, supra*, 529 U.S. at p. 252.) It then reviewed Georgia's parole suitability criteria, which "illustrate[d] the broad discretion the Parole Board possesses in determining whether an inmate should receive early release." (*Id*. at p. 253.) Georgia law required the parole board to consider a prisoner's good conduct, reading ability, and efficient performance of his or her duties. It provided that " '[n]o inmate shall be placed on parole until and unless the board shall find that there is a reasonable probability that . . . he will live and conduct himself as a respectable and law-abiding person and that his release will be compatible with his own welfare and the welfare of society.' " (*Id.* at p. 252.) The law also prohibited parole unless the board was satisfied that the prisoner would have employment or not otherwise become a public burden. "Only upon a showing that the Board engaged in a 'gross abuse of discretion' [could] a prisoner challenge a parole denial in the Georgia courts." (*Id.* at p. 253.)

The court acknowledged that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause," but added that, to the extent notice of

21

the potential penalty prior to the commission of an offense is an aspect of ex post facto doctrine, "we can say with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions. [Citation.] The essence of respondent's case, as we see it, is not that discretion has been changed in its exercise but that, in the period between parole reviews, it will not be exercised at all." (*Garner, supra*, 529 U.S. at pp. 253-254.)

With respect to the concern that discretion would not be exercised during the longer period between hearings, the court noted that "[t]he law changing the frequency of parole reviews is qualified in two important respects. First, the law vests the Parole Board with discretion as to how often to set an inmate's date for reconsideration, with eight years for the maximum. [Citation.] Second, the Board's policies permit 'expedited parole reviews in the event of a change in their circumstance or where the Board receives new information that would warrant a sooner review.' " (*Garner, supra*, 529 U.S. at p. 254.) The court concluded that "[t]hese qualifications permit a more careful and accurate exercise of the discretion the Board has had from the outset. Rather than being required to review cases *pro forma,* the Board may set reconsideration dates according to the likelihood that a review will result in meaningful considerations as to whether an inmate is suitable for release. The Board's stated policy is to provide for reconsideration at 8-year intervals 'when, in the Board's determination, it is not reasonable to expect that parole would be granted during the intervening years.' [Citation.] The policy enables the Board to put its resources to better use, to

22

ensure that those prisoners who should receive parole come to its attention. By concentrating its efforts on those cases identified as having a good possibility of early release, the Board's Rules might result in the release of some prisoners earlier than would have been the case otherwise." (*Garner, supra*, 529 U.S. at p. 254.)

The court rejected the lower court's view that it " 'seem[ed] certain' " some prisoners would remain incarcerated for a longer period than under the previous law. "The standard announced in *Morales* requires a more rigorous analysis of the level of risk created by the change in law. [Citation.] When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." (*Garner, supra*, 529 U.S. at p. 255.) The evidence in the record in *Garner* did not contain adequate information to determine whether the change in the law had lengthened the prisoner's time of incarceration.

The court also faulted the lower court's failure to consider the parole board's internal policy statement. "It is often the case that an agency's policies and practices will indicate the manner in which it is exercising its discretion." (*Garner, supra*, 529 U.S. at p. 256.) It noted that "[i]n *Morales*, we relied upon the State's representation that its parole board had a practice of granting inmates' requests for early review. [Citation.] The policy statement here, by contrast, is a formal, published statement as to how the Board intends to enforce its Rule. It follows *a fortiori* from *Morales* that the Court of Appeals should not have disregarded the policy. Absent any demonstration to the contrary from respondent, we respect the Board's representation that inmates, upon making a

23

showing of a 'change in their circumstance[s]' or upon the Board's receipt of 'new information,' may request expedited consideration." (*Id.* at pp. 256-257.)

Finally, the court noted that the prisoner claimed he had not been allowed sufficient discovery, and stated that "[t]he matter of adequate discovery is one for the Court of Appeals or, as need be, for the District Court in the first instance." (*Garner, supra*, 529 U.S. at p. 257.) Therefore, it remanded the case for further proceedings.

## C. Is there a significant risk the changes will prolong a prisoner's incarceration?

As the court observed in *Garner, supra*, 529 U.S. at page 252, analysis of whether a change in parole procedures violates ex post facto principles requires consideration of how the change operates within the context of the entire parole system. Therefore, we begin with a review of California's parole system.

### 1. California's parole system

The power to grant parole lies with the Board. (§§ 3040, 5075 et seq.) A panel of two or more commissioners or deputy commissioners must meet one year prior to a prisoner's minimum eligible parole release date to consider whether to set a parole date.[11] "The panel . . . shall set a release date unless it determines that

---

[11] The minimum release date is addressed in section 3046, which provides that "[n]o prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following: [¶] (1) A term of at least seven calendar years. [¶] (2) A term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole." (§ 3046, subd. (a).) The calculation of sentences when a person is convicted of multiple crimes is addressed in section 669, which provides that "[w]henever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046 or pursuant to any other section of law that

*(Footnote continued on next page.)*

24

the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (§ 3041, subd. (b).)

Section 3041 directs the Board to "establish criteria for the setting of parole release dates." (§ 3041, subd. (a).) Pursuant to this directive, the Board has promulgated regulations identifying circumstances that tend to indicate suitability or unsuitability for release on parole. The circumstances identified in the regulations "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2281, subds. (c), (d).)[12]

The Board's regulations identify six circumstances that tend to indicate unsuitability for release on parole: (1) the commitment offense was committed "in

---

*(Footnote continued from previous page.)*

establishes a minimum period of confinement under the life sentence before eligibility for parole."

[12] Division 2 of title 15 of the California Code of Regulations sets forth regulations related to the functions of the Board. (Cal. Code Regs., tit. 15, §§ 2000-2870.) Chapter 3 of division 2 sets forth regulations concerning procedures for parole. (*Id*., §§ 2230-2439.1.) Within chapter 3, the articles that address the criteria and guidelines related to the granting or denial of parole are divided into articles based upon the crime that is the basis of the life sentence. (*Id*., §§ 2280-2292 [murders committed before Nov. 8, 1978, and aggravated kidnapping], 2400-2411 [murders committed on or after Nov. 8, 1978, and specified attempted murders], 2420-2429.1 [habitual offenders sentenced under § 667.7], 2430-2439.1 [sex offenders sentenced under § 667.51].) As relevant here, the provisions are substantially identical among the various articles. Therefore, in our summary we cite only one set of regulations, those set forth in article 5. (*Id*., §§ 2280-2292.)

25

an especially heinous, atrocious or cruel manner," including factors such as multiple victims, a dispassionate and calculated manner, abuse or defilement of the victim, an exceptionally callous disregard for human suffering, and an inexplicable or trivial motive; (2) a previous record of violence, particularly at an early age; (3) a history of unstable or tumultuous relationships; (4) previous sadistic sexual offenses; (5) a lengthy history of severe mental problems related to the crime; and (6) serious misconduct while incarcerated. (Cal. Code Regs., tit. 15, §§ 2281, subd. (c).)

The regulations identify nine circumstances that tend to show suitability for release on parole: (1) the absence of a juvenile record; (2) a history of reasonably stable relationships with others; (3) actions that tend to demonstrate remorse, including attempting to assist the victim and exhibiting an understanding of the nature and magnitude of the crime; (4) the commission of the crime was "the result of significant stress in [the prisoner's] life, especially if the stress had built over a long period of time"; (5) the actions were the result of "Battered Woman Syndrome"; (6) the absence of a significant criminal history; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) activities in prison that "indicate an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2281, subd. (d).)

The Board applies these criteria to "attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. [Citation.] 'The [Board's] exercise of its broad discretion "involves the deliberate assessment of a wide variety of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and of the public." [Citation.]' [Citation.] 'The [Board's]

26

discretion in parole matters has been described as "great" [citation] and "almost unlimited" [citation].' [Citation.]" (*Rosenkrantz, supra,* 29 Cal.4th at p. 655.) The Board's discretion is limited only by the requirements that it provide an individualized consideration of all relevant factors, provide a written statement that sets forth its reasons for denying a parole date, and not render an arbitrary decision. (*Ibid.*)

If the Board determines a prisoner is suitable for parole, it then sets a parole date. "The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." (§ 3041, subd. (a).)

Pursuant to section 3041, the Board has promulgated regulations that establish criteria for setting parole release dates, including regulations that establish a life prisoner's "total life term." (Cal. Code Regs., tit. 15, §§ 2285-2289.) The Board's regulations require the panel to set a "base term," which the panel derives by considering all of the circumstances of the most serious of the life offenses the prisoner committed. The regulations set forth matrices of factors that determine the lower, middle, and upper base terms for particular crimes.[13] "The

---

[13]  For example, when the most serious offense is kidnapping for robbery, as Vicks committed, the matrix considers the distance, duration, and destination of the movement, whether the victim was taken as a hostage, whether the crime involved intricate prior planning, whether the victim was sexually assaulted or otherwise seriously injured or assaulted, and how significant the injuries were. A crime involving minor movement and minor injury is assigned a base term range of 8, 10 or 12 years, while a crime involving intricate planning, and in which the victim suffered major injuries, is assigned a base term range of 13, 15, or 17 years. (Cal. Code Regs., tit. 15, § 2282, subd. (c).)

27

panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation." (*Id*., § 2282, subd. (a);[14] see generally *In re Dannenberg* (2005) 34 Cal.4th 1061, 1078-1079.) Circumstances in aggravation include such factors as the vulnerability of the victim, whether there was a special relationship of confidence and trust with the victim, and the prisoner's leadership role in the crime. (Cal. Code Regs., tit. 15, § 2283, subd. (a).) Circumstances in mitigation include such factors as whether the prisoner was induced by others to commit the crime, whether the prisoner tried to help the victim, and whether the crime was committed in unusual circumstances unlikely to reoccur. (*Id*., § 2284.) After the panel determines the base term through consideration of the matrices and any aggravating or mitigating circumstances, it adds terms for personal use of a firearm and for other offenses, resulting in a total life term. (*Id*., §§ 2285-2289.)

If the prisoner has already served more time than the total life term calculated pursuant to the regulations, the prisoner is to be transferred from prison to parole supervision in the community, but the release date may not be earlier than the period during which the Board and the Governor may review parole decisions, which is described below. (Cal. Code Regs., tit. 15, § 2289; see, e.g., *In re Lawrence* (2008) 44 Cal.4th 1181, 1199 [appropriate term calculated pursuant

---

[14] Like the regulations related to the criteria and guidelines for the consideration of suitability for parole, the regulations related to setting the base term and a parole date are divided among articles based upon the crime that is the basis of the life sentence. (Cal. Code Regs., tit. 15, §§ 2282-2292 [murders committed before Nov. 8, 1978, and aggravated kidnapping], 2403-2411 [murders committed on or after Nov. 8, 1978, and specified attempted murders], 2423-2429.1 [habitual offenders sentenced under § 667.7], 2433-2439.1 [sex offenders sentenced under § 667.51].) As in our summary of suitability factors, we cite only one set of regulations, those set forth in article 5. (*Id*., §§ 2280-2292.)

to the matrices was less than half of the prisoner's nearly 24 years in prison]; *In re Bush* (2008) 161 Cal.App.4th 133, 138-139 [prisoner whose base term was 12 years six months had custody credits exceeding 20 years when he was found suitable for parole]; see also Cal. Criminal Law:  Procedure and Practice (Cont.Ed.Bar 2011) § 47.46, p. 1555 ["It is very common that when a lifer is found suitable, he or she has already served time under the appropriate matrix"].)  If the prisoner has not yet served the appropriate term calculated pursuant to the regulations, a proposed release date will be set.  If that date is 10 months or longer after the hearing at which the prisoner is found suitable for parole, a progress hearing will be held a specified number of months before the parole date, to determine whether the parole date should be advanced based upon good conduct in prison.  (Cal. Code Regs., tit. 15, § 2269.)

The proposed decision becomes final 120 days after the hearing.  During the 120-day period, the Board may review the decision.  (§ 3041, subd. (b).)  "Any person on the hearing panel may request review of any decision regarding parole for an en banc hearing by the board."  (§ 3041, subd. (a).)  In addition, by regulation, proposed grants of parole and a random sample of proposed denials of parole must be reviewed by the Board's chief counsel or a designee.  If the chief counsel recommends a modification to the decision that is adverse to the prisoner, the recommendation "shall be referred to the full board for en banc review."  (Cal. Code Regs., tit. 15, § 2041, subd. (h).)  The chief counsel may also recommend a new hearing, but "[n]o proposed decision shall be referred for a new hearing without a majority vote of the board following a public hearing."  (*Ibid*.)  "The panel's decision shall become final . . . unless the board finds that the panel made an error of law, or that the panel's decision was based on an error of fact, or that new information should be presented to the board, any of which when corrected or considered by the board has a substantial likelihood of resulting in a substantially

29

different decision upon a rehearing." (§ 3041, subd. (b).) Unlike the scheme considered in *Morales, supra*, 514 U.S. 499, the current scheme does not have provisions for an administrative appeal of a decision denying parole. (Cal. Code Regs., tit. 15, former §§ 2050-2057, repealed in 2004.)

During the 30-day period following finality of the Board's decision, when the commitment offense is murder, the Governor "may only affirm, modify, or reverse the decision . . . on the basis of the same factors which the [Board] is required to consider." (Cal. Const., art. V, § 8, subd. (b); see § 3041.2.) The Governor's discretion with respect to parole decisions is as broad as the Board's discretion. The Governor's "decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious," but "[r]esolution of any conflicts in the evidence and the weight to be given the evidence" and "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor . . . ." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) "Although 'the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision' [citation], the Governor undertakes an independent, de novo review of the inmate's suitability for parole [citation]. Thus, the Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety." (*In re Lawrence, supra*, 44 Cal.4th 1181, 1204.)[15]

---

[15] In addition to the Governor's authority, in the 30 days following finality of the Board's decision, to reverse grants of parole *when the commitment offense is murder*, the Governor has authority, "[u]p to 90 days prior to a scheduled release date, . . . [to] request review of any decision by a parole authority concerning the grant or denial of parole to any inmate in a state prison. The Governor shall state the reason or reasons for the request, and whether the request is based on a public safety concern, a concern that the gravity of current or past convicted offenses

*(Footnote continued on next page.)*

30

The decisions of the Board and of the Governor are subject to the same level of judicial scrutiny: a court inquires whether there is "some evidence" related to the relevant factors that supports the decision. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 658, 667.) Because "the fundamental consideration in parole decisions is public safety" (*In re Lawrence, supra*, 44 Cal.4th at p. 1205), "the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Id*. at p. 1212.) "It is settled that under the 'some evidence' standard, '[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is

*(Footnote continued from previous page.)*

may have been given inadequate consideration, or on other factors. When a request has been made, the request shall be reviewed by a majority of commissioners specifically appointed to hear adult parole matters and who are holding office at the time. In case of a review, a vote in favor of parole by a majority of the commissioners reviewing the request shall be required to grant parole to any inmate. In carrying out any review, the board shall comply with the provisions of this chapter." (§ 3041.1.)

limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' [Citations.]" (*In re Shaputis* (2011) 53 Cal.4th 192, 210.)

### 2. Analysis

#### a. Facial challenge

With this background, we consider whether Marsy's Law "creates a significant risk of prolonging [Vicks's] incarceration." (*Garner, supra*, 529 U.S. at p. 251; see also *Morales, supra*, 514 U.S. at p. 509 ["we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes"].) Marsy's Law did not change the timing of the first parole suitability hearing, the factors to be considered in deciding whether a prisoner is suitable for parole, the criteria for setting a parole date once a prisoner is found suitable for parole, or the standard of review of parole decisions. As explained above, Marsy's Law eliminated the requirement that Vicks's next parole hearing be set annually or deferred at most up to two years if it was not reasonable to expect that the prisoner would be suitable for parole within a year. Instead, Marsy's Law prohibits the Board, at the time that a prisoner is found unsuitable for parole, from setting a parole hearing sooner than three years after the finding of unsuitability, and mandates that it set the parole hearing 15 years after the finding of unsuitability, "unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates . . . are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than 10 additional years." (§ 3041.5, subd. (b)(3)(A).) If the board makes such a finding, the next hearing shall be in 10 years, unless the board finds by clear and convincing evidence that a period of more than seven years is not required. (§ 3041.5, subd. (b)(3)(B).) In that event, the next hearing shall be in seven, five, or three years. (§ 3041.5, subd. (b)(3)(C).)

32

These changes exceed the revisions considered in *Morales, supra*, 514 U.S. 499. The provisions of Marsy's Law apply to all life prisoners, whereas the new parole provisions in *Morales* applied only to those who had killed more than one person, "a class of prisoners for whom the likelihood of release on parole is quite remote." (*Morales, supra,* at p. 510.) Marsy's Law also deprives the Board of discretion at the outset to schedule the next parole hearing in less than three years, whereas the amendments considered in *Morales* retained the one-year deferral period unless the Board found that it was not reasonable to expect that the prisoner would be suitable for parole in a year. In addition to shifting the presumption from the shorter deferral period to a longer deferral period, Marsy's Law imposes a heightened evidentiary standard upon the Board that must be met before it may initially schedule a hearing sooner than the default period of 15 years.

As we have noted, however, in *Garner, supra*, 529 U.S. 244, the Supreme Court rejected the prisoner's focus on the differences between the changes considered in *Morales* and the changes in Georgia's parole scheme challenged in *Garner*. "These differences are not dispositive. The question is whether the amended Georgia Rule creates a significant risk of prolonging [the prisoner's] incarceration." (*Garner, supra,* at p. 251.) The high court recognized that the broad discretion associated with the function of determining when a prisoner may be released on parole encompasses discretion "to change and adapt based on experience." (*Id.* at p. 253.) Thus, the issue is not whether the manner in which discretion is exercised has been changed but whether, "in the period between parole reviews, [discretion] will not be exercised at all." (*Id.* at p. 254.) Therefore, we focus on whether the changes in the hearing schedule effected by Marsy's Law create a significant risk that there will be a period between parole reviews when the elimination of a hearing that would have been required under the former law creates a significant risk of prolonging incarceration.

33

We begin with the increase in the minimum period between regularly scheduled parole hearings. The Board has no discretion, *at the time parole is denied*, to schedule the next hearing as early as had been allowed by the statutory scheme in effect at the time Vicks committed his crimes. Marsy's Law does, however, give the Board unfettered discretion to advance the date of the next parole hearing "when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner provided" by the statutory deferral periods. (§ 3041.5, subd. (b)(4).) These provisions reflect a judgment that the previous schedule for parole hearings had been overly optimistic with respect to the speed with which prisoners become suitable for parole. Rather than assuming that all prisoners may become suitable for parole within a shorter period of time, Marsy's Law assumes otherwise and takes a "wait and see" approach. Rather than requiring earlier hearings in all cases regardless of whether there is a reasonable likelihood the prisoner will be suitable for parole, it authorizes earlier hearings only if there is a reasonable likelihood the prisoner no longer poses a threat to society.

The Court of Appeal viewed the authority of the Board to advance hearings sua sponte as inadequate to prevent longer periods of incarceration. In its view, "[b]ecause there is no mechanism by which the [Board] might sua sponte *generate* new information, or any mechanism by which the [Board] might sua sponte *learn* of either new information or changed circumstances on which it might act, an inmate who would have obtained a new hearing as early as one year after his or her last hearing must now wait a *minimum* of three years before obtaining a new hearing. Thus, although sua sponte advanced hearings are nominally available, it appears 'the rule's practical implementation . . . will result in a longer period of incarceration than under the earlier rule' (*Garner, supra,* 529 U.S. at p. 255)

34

because of the absence of any practical method for triggering this advanced hearing."

The portion of *Garner*'s analysis on which the Court of Appeal relied relates to a claim that a change in the law, *as applied*, creates a significant risk of prolonged incarceration. In connection with a *facial* challenge, *Garner* identified the inquiry as whether the requisite risk was "inherent in the framework" of the amended scheme. (*Garner, supra*, 529 U.S. at p. 251.) If the risk is not inherent in the new scheme, then the risk must be "demonstrated on the record." (*Ibid*.) In reiterating these two steps of the analysis, the court stated that "[w]hen the [amended scheme] does not by its own terms show a significant risk, the [challenger] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier [scheme]." (*Id*. at p. 255.) Thus, in considering a facial challenge, the court's focus is on any risk inherent in the statutory scheme rather than on the practical implementation of the scheme. Therefore, in *Garner*, the court identified as an important aspect of Georgia's scheme "the Board's policies [permitting] 'expedited parole reviews in the event of a change in their circumstance or where the Board receives new information that would warrant a sooner review' " (*id*. at p. 254), but in connection with its facial review, the court did not evaluate whether there were mechanisms that would ensure the Board would become aware of changed circumstances or new information that might give rise to expedited parole reviews.

Here, the Board has not described to this court any policies or practices it follows with respect to the exercise of its authority to advance hearings, and counsel were unaware at oral argument of any policies or practices related to the Board's authority. As explained below, however, our review of the new statutory

provisions leads us to conclude that the scheme may function in a manner that mitigates the risk that the Board will fail to exercise its discretion at a point in time when it might have exercised its discretion under the prior scheme and concluded that a prisoner was suitable for parole. Therefore, we conclude that a significant risk of prolonging incarceration "is not inherent in the framework" of the parole system as amended by Marsy's Law. (*Garner, supra*, 529 U.S. at p. 251.)

First, although Marsy's Law does not require an internal review or evaluation of whether there is a reasonable probability that a prisoner has become suitable for parole at some interim point in the lengthier deferral period, implicit in the Board's authority to grant parole (§ 3040) and its authority to advance the date of the next parole suitability hearing "when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner provided" (§ 3041.5, subd. (b)(4)), is the authority to direct its staff to review a particular prisoner's circumstances at any time to determine if there is a reasonable likelihood the prisoner is suitable for parole. For example, if the panel is of the view that the prisoner may be suitable for parole in one year, it may direct staff to conduct an internal review at a future date to determine whether a change in circumstances — which may relate solely to the passage of time — establishes a reasonable likelihood that further incarceration is not required to protect the public.[16] (See *In re Lawrence, supra*, 44 Cal.4th at pp. 1219-1220 ["the

---

[16] Under the former law, when the Board deferred a hearing for five years, a deputy commissioner was required to review the prisoner's central file within three years, and could order that the next hearing be held within one year. (§ 3041.5, former subd. (b)(2)(B); Stats. 1994, ch. 560, § 1, p. 2834; Cal. Code Regs, tit. 15, § 2270, subd. (d); see Cal. Code Regs., tit. 15, § 3000 ["central file" is "a master file maintained by the department containing records regarding each person committed to its jurisdiction"]; see Cal. Department of Corrections and

*(Footnote continued on next page.)*

36

Legislature considered the passage of time — and the attendant changes in a prisoner's maturity, understanding, and mental state — to be highly probative to the determination of current dangerousness"].) Similarly, if the factors preventing a finding of suitability may be amenable to correction in a short period of time, such as inadequacies in a prisoner's parole plans, the panel may direct that if information is received reflecting that such factors have been addressed, an internal review must be conducted to determine whether the change in circumstances establishes a reasonable likelihood that further incarceration is not required.

Second, "[a]n inmate may request that the board exercise its discretion to advance a hearing . . . to an earlier date, by submitting a written request to the board . . . which shall set forth the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration of the inmate." (§ 3041.5, subd. (d)(1).) This provision allows the prisoner to bring to the Board's attention changes that may warrant an earlier hearing. As explained above, a prisoner may file his or her first petition any time after the denial of parole at a regularly

---

*(Footnote continued from previous page.)*

Rehabilitation Operations Manual, ch. 7, art. 5, pp. 607-608, <http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/DOM/DOM%20201 2/2012%20DOM-Combined.pdf> [description of contents of central file] [as of Mar. 4, 2013].)
    Under Marsy's Law, the Board may identify cases in which interim review of the prisoner's central file would be appropriate, and thereby may concentrate its resources on cases in which there is a possibility of release on parole. (§ 3041.5, subd. (b)(4); see *Garner, supra*, 529 U.S. at p. 254 [Georgia parole board's policy of deferring review for eight years when it is not reasonable to expect that parole would be granted sooner allows the board to concentrate its efforts on cases in which there is a good possibility of release on parole].)

scheduled hearing, and then may file a petition every three years. (See *ante*, pp. 12-13.)

In connection with either of these two routes to earlier consideration of suitability, if the Board concludes that there is *not* a reasonable likelihood that the prisoner will be suitable for parole earlier, the hearing will not be advanced and the prisoner might be deprived of a hearing to which he or she would have been entitled under prior law. In light of the Board's conclusion that there is not a reasonable likelihood of suitability, however, and given the Board's very broad discretion to resolve the issue of suitability, the prisoner will not thereby be deprived of an earlier release date.

There remains a possibility that there will be prisoners who become suitable for parole and are precluded from petitioning for an advanced hearing because less than three years has passed since the prisoner's last request.[17] We do not find that this possibility creates a significant risk of prolonging a prisoner's incarceration. Most of the circumstances relevant to suitability for parole in California are not of a type amenable to rapid change. Many of the circumstances relate to historical events such as the circumstances of the crime, including actions toward the victim during and after its commission, the prisoner's previous record,

---

[17] In considering this possibility, we do not mean to suggest that communications with the Board concerning a prisoner's suitability for parole are barred during the three-year intervals between petitions to advance. Although Marsy's Law limits the frequency with which a prisoner may file a formal petition to advance a hearing, it does not prohibit other communications with the Board. If a significant change relevant to a prisoner's suitability for parole occurs at a time when the prisoner is precluded from filing another petition to advance the hearing, the prisoner or any other person may convey the information to the Board. Because the Board has discretion at any time to advance the hearing based on a change in circumstances or new information, it may advance a hearing in response to such communications.

38

and the prisoner's history of relationships. The Board also considers factors such as the prisoner's understanding of the nature and magnitude of the crime, the prisoner's age, the prisoner's development of marketable skills, the prisoner's activities in prison, and the prisoner's plans for employment and residence. At the time the Board determines that a prisoner is not suitable for parole, it is able to evaluate what further period of time will be required to overcome whatever deficits the Board has identified with respect to suitability. If the Board believes the deficits require less than three years to overcome, the Board may direct, as discussed above, that there be an internal review earlier than the next scheduled hearing to determine whether there is a reasonable likelihood the prisoner will be found suitable for parole. If the Board, which has almost unlimited discretion to resolve the issue of suitability, is of the view at the time it denies parole that the deficits require three or more years to remedy, it is unlikely that there will come a time between the denial of a request to advance a hearing and the next scheduled hearing, or during the three years until the next request to advance may be filed, that a prisoner will become suitable for parole. (See *Garner, supra*, 529 U.S. at p. 255 [rejecting "the Court of Appeals' supposition that [the change in Georgia's parole procedures] 'seems certain' to result in some prisoners serving extended periods of incarceration. . . . *Morales* requires a more rigorous analysis of the level of risk"].)[18]

---

[18]    Because of differences among different panels of commissioners, there is some possibility that a prisoner's chance of being found suitable for parole is enhanced by more frequent parole hearings, which increase the chance that the prisoner will be considered by a more sympathetic panel. In rejecting judicial "micromanagement of an endless array of legislative adjustments to parole and sentencing procedures" in *Morales*, the high court identified "changes to the membership of the Board" as an "innocuous adjustment[]." (*Morales, supra*, 514 U.S. at p. 508; see *Gilman v. Davis* (E.D.Cal. 2010) 690 F.Supp.2d 1105, 1121,

*(Footnote continued on next page.)*

The Board's authority to advance a hearing when there is a reasonable likelihood the prisoner will be found suitable for parole creates a scheme that is similar in substance to the scheme considered in *Garner, supra*, 529 U.S. 244, which was found not to violate ex post facto principles. As noted above, Georgia's law vested its parole board with discretion to defer the next hearing for any period up to eight years, rather than the previous deferral period of three years, and Georgia's parole board's policies authorized " 'expedited parole reviews in the event of a change in their circumstance or where the Board receives new information that would warrant a sooner review.' " (*Id*. at p. 254.) The high court observed that "[t]hese qualifications permit a more careful and accurate exercise of the discretion the Board has had from the outset. Rather than being required to review cases *pro forma*, the Board may set reconsideration dates according to the likelihood that a review will result in meaningful consideration as to whether an inmate is suitable for release." (*Ibid*.) The court also noted the board's policy to defer the next hearing for eight years, rather than the previous deferral period of three years, " 'when, in the Board's determination, it is not reasonable to expect that parole would be granted during the intervening years' " (*ibid*.), and concluded that "[t]he policy enables the Board to put its resources to better use, to ensure that those prisoners who should receive parole come to its attention. By concentrating its efforts on those cases identified as having a good possibility of early release, the Board's Rules might result in the release of some prisoners earlier than would have been the case otherwise." (*Ibid*.)

---

*(Footnote continued from previous page.)*

fn. 13 [although changes in the Board may affect the likelihood of release, such changes "would not ordinarily constitute an Ex Post Facto violation"].)

40

Similarly, Marsy's Law frees the Board from pro forma review of cases and authorizes advanced review when a change in circumstances or new information establishes a reasonable likelihood that the prisoner does not pose a danger to the public.  (§ 3041.5, subds. (b)(4), (d)(1).)  We recognize that *Garner* referred to the Georgia parole board's discretion *at the outset* to defer the next hearing for a shorter period as an important qualification (*Garner, supra*, 529 U.S. at p. 254), and that Marsy's Law does not give California's Board the same discretion, but the absence of such discretion in California's system does not introduce a significant risk of prolonging incarceration because once the Board sets a date for the next hearing in accordance with the requirements of Marsy's Law, the Board has unfettered discretion to advance the hearing any time new information or a change in circumstances indicates that there is a reasonable likelihood the prisoner is suitable for parole.  As noted above, the passage of time, during which the Board may expect positive changes in the prisoner's maturity, understanding, and mental state, is a changed circumstance.

Georgia's scheme will result in earlier hearings in cases in which its parole board believed at the outset that the prisoner would be suitable for parole at an earlier date, even when that prediction is incorrect and the prisoner is not suitable for parole at the earlier date, whereas Marsy's Law does not afford an earlier hearing unless there is a change in circumstances or new information that supports holding an earlier hearing.  Each approach affords the prisoner a hearing when it appears he or she may be suitable for parole, but California's approach will eliminate some hearings at which the prisoner would not be found suitable for parole.

For the same reasons, any risk of prolonged incarceration introduced by various other changes effected by Marsy's Law is mitigated by a prisoner's right to seek an advanced hearing and the Board's discretion to advance a hearing at any

41

time a change in circumstances or new information establishes a reasonable probability of suitability for parole. The provisions of Marsy's Law that (1) increase the maximum deferral period to 15 years, (2) shift the presumption regarding whether to set an earlier or later date to favor a longer deferral period, and (3) impose a burden of clear and convincing evidence before a hearing may be set for a date earlier than 15 years (§ 3041.5, subd. (b)(3)) affect only the date scheduled *at the time parole is denied*. In cases in which these provisions compel the Board to select a deferral period that is longer than the Board believes will probably be necessary to overcome the prisoner's deficits, the Board may, at the time it denies parole, direct staff to conduct an internal review at an earlier date to determine whether a change in circumstances establishes a reasonable likelihood that further incarceration is not required to protect the public. In cases in which the Board selects a long deferral period with no expectation that the prisoner will be suitable for parole at an earlier date, the prisoner may bring changed circumstances and new information to the Board's attention every three years. In the latter cases, given that the Board, in the exercise of its very broad discretion, has determined that a long period of additional incarceration will be required, and given the nature of the criteria related to suitability for parole, many of which are not amenable to rapid change, it is highly unlikely that a prisoner will become suitable for parole in a shorter period than the three years between applications to advance the hearing.

These provisions requiring the Board to choose a longer deferral period are similar to the Georgia parole board's policy to defer reconsideration for the maximum period allowed under the new law (eight years rather than the prior three years) " 'when, in the Board's determination, it is not reasonable to expect that parole would be granted during the intervening years.' " (*Garner, supra*, 529 U.S. at p. 254.) Each scheme favors longer deferrals that exceed the maximum

42

deferral previously allowed, but each authorizes the advancement of a hearing in the event of a change in circumstances or new information.

Although multiple changes to the parole scheme contribute to longer periods between hearings, the changes have no cumulative effect that would create a significant risk of prolonged incarceration. (See *Morales, supra*, 514 U.S. at p. 509; *Garner, supra*, 529 U.S. at p. 250 [the question of whether a retroactive procedural change creates a significant risk of prolonging a prisoner's incarceration is " 'a matter of "degree" ' "].) Regardless of whether a hearing is deferred for three years or 15 years, the risk that the prisoner will remain incarcerated longer than under the prior scheme is mitigated by the Board's discretion to advance a hearing any time there is a change in circumstances or new information. Although a deferral of 15 years might seem to increase the risk more than a deferral of three years, any enhanced risk is mitigated by fact that the prisoner may petition every three years to advance the hearing, and the fact that the Board, which has broad discretion to determine suitability for parole, has determined that a lengthier deferral period is warranted. The Board's determination reflects that the factors impeding a finding of suitability for parole are not amenable to rapid change, and an earlier hearing will not result in a finding of suitability for parole.

Vicks raises several other arguments, in addition to those based on *Morales* and *Garner*. First, he contends that a parole hearing "affects a critical stage of the criminal process, the sentencing phase of a criminal case," and that by imposing the clear and convincing burden of proof before the Board may impose a deferral period of less than 15 years, Marsy's Law "imposes an unlawful shifting of the burden of proof to the defense at a critical stage of the criminal proceedings." He cites three cases in support of his conclusion. In *People v. Doolin* (2009) 45 Cal.4th 390, 453, we acknowledged that *sentencing* is a critical stage in a criminal

43

prosecution.  In *In re Roberts* (2005) 36 Cal.4th 575, 589-590, in the course of analyzing whether a petition for writ of habeas corpus challenging the denial of a parole date should be filed in the county in which the prisoner is incarcerated or the county in which the prisoner was sentenced, we observed that "a sentence contemplates a period of parole, which in that respect is related to the sentence," and that "the objectives of sentencing and parole are related . . . ."  (*Id*. at p. 590.)  Finally, in *Santosky v. Kramer* (1982) 455 U.S. 745, the high court explained that the government's burden of proof is heightened when it seeks to deprive a party of liberty or life, and it held that the due process clause requires the state to establish by clear and convincing evidence the facts required to support an order terminating parental rights.  Certainly, in the criminal proceeding that concluded with defendant's conviction and sentence, the government bore the burden of proving beyond a reasonable doubt the facts underlying the conviction and sentence, but none of the authorities he cites support the proposition that the determination of the initial deferral period at a hearing at which parole is denied is a critical stage of criminal proceedings, or that altering the burden of proof associated with the decision concerning the timing of the next parole hearing violates ex post facto principles.

Vicks also contends that the changes enacted by Marsy's Law violate the ex post facto clause because they "lead to more onerous results than under the prior law."  The authorities he cites, which we summarize below, involve substantive changes in the scheme for calculating the time to be served.  In contrast, Marsy's Law alters only the procedure by which the date of the next parole hearing is set, and it allows the date to be changed whenever there is a reasonable probability that the prisoner may be found suitable for parole; it does not alter the calculation of the sentence, the calculation of credits, the criteria relevant to the determination of

44

suitability for parole, or the criteria relevant to the determination of the parole date once a prisoner is found suitable for parole.

In *Weaver v. Graham, supra*, 450 U.S. 24, the state reduced the rate at which the prisoner accumulated credit for good behavior in prison. Although the new law included provisions pursuant to which a prisoner could earn discretionary credit, "the new provision constrict[ed] the inmate's opportunity to earn early release, and thereby [made] more onerous the punishment for crimes committed before its enactment." (*Id*. at pp. 35-36.) Marsy's Law does not alter the standards for earning release on parole.

In *Miller v. Florida, supra*, 482 U.S. 423, the presumptive sentencing range was increased between the time that the defendant committed his offenses and the time he was sentenced to seven years in prison. To have imposed a seven-year sentence under the prior scheme, the judge would have been required to provide clear and convincing reasons for varying from the presumptive sentence range, and the decision to depart from the presumptive range would have been reviewable on appeal. Under the new scheme, the seven-year sentence could be imposed without providing any reasons, and the decision was not reviewable on appeal. (*Id*. at pp. 432-433.) The court acknowledged that "no *ex post facto* violation occurs if the change in the law is merely procedural and does 'not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt' " (*id*. at p. 433), but found that the revised guidelines did not merely change the procedure for arriving at a sentence, they increased the " 'quantum of punishment' " for defendant's crimes. (*Id*. at p. 434.) Marsy's Law, however, changes the procedures for scheduling hearings, but does not change the standards that determine eligibility for release on parole.

In *Himes v. Thompson* (9th Cir. 2003) 336 F.3d 848, the court considered a change in the law governing the rerelease of a prisoner after parole has been

revoked. The new law required the parole board, in cases in which it found "aggravation" in connection with the prisoner's violation of parole, to deny rerelease and to require the prisoner to serve the remainder of the term, twenty-nine and a half years in Himes's case. The prior law had given the board discretion to choose from a continuum of terms when it found aggravation, "anywhere from a few months to the entirety of the prison term. For prisoners like Himes, for whom the remaining prison term was quite lengthy, the Board of Parole [under the prior law] would likely have imposed the entire prison term only under extraordinary circumstances. So the change in regulatory regime, viewed in its entirety, significantly increased the possibility of serving a lengthy re-incarceration period under the new regime." (*Id*. at pp. 859-860.) Therefore, the change in the law "created a significant risk of a more onerous sentence." (*Id*. at p. 855.) Marsy's Law does not constrain the Board's authority to set a parole date at whatever point in time the prisoner is suitable for parole.

Vicks notes that, in addition to increasing the potential deferral period, shifting the presumption to favor a longer deferral period, and imposing a "clear and convincing" evidentiary burden to deferring a hearing for fewer than 15 years, Marsy's Law requires the Board to "consider[] the views and interests of the victim" (§ 3041.5, subd. (b)(3)) before exercising its discretion to select the proper deferral period or to advance a hearing date. (*Id*., subd. (b)(4).) He characterizes this requirement as permitting victims "a say" in the frequency of parole hearings, and as incorporating public outcry into the equation that determines when a prisoner will be found suitable for parole. (See *In re Dannenberg* (2009) 173 Cal.App.4th 237, 255, fn. 5 [rejecting the Governor's reliance on the district attorney's opinion that the prisoner lacked insight; the district attorney's and the Governor's opinions are not evidence regarding suitability for parole]; *In re Weider* (2006) 145 Cal.App.4th 570, 590 [family's statements may influence the

46

weight the Board gives to the evidence, but opposition of victim's next of kin is not evidence of unsuitability for parole].)

The parole scheme has long required consideration of the victim's views in connection with the Board's evaluation of a prisoner's suitability for parole.  In 1982, prior to Vicks's crimes, the voters approved Proposition 8, The Victims' Bill of Rights.  Among the provisions Proposition 8 enacted was section 3043, which gives victims "the right to appear, personally or by counsel, at the [parole suitability] hearing and to adequately and reasonably express his, her, or their views concerning the prisoner and the case, including, but not limited to the commitment crimes, determinate term commitment crimes for which the prisoner has been paroled, any other felony crimes or crimes against the person for which the prisoner has been convicted, the effect of the enumerated crimes on the victim and the family of the victim, the person responsible for these enumerated crimes, and the suitability of the prisoner for parole."  (§ 3043, subd. (b)(1).)  As enacted in 1982, section 3043 also provided that "[t]he board, in deciding whether to release the person on parole, shall consider the statements of victims and next of kin . . . ."  Marsy's Law amended section 3043 to require that "[t]he board, in deciding whether to release the person on parole, shall consider the entire and uninterrupted statements of victims or victims, next of kin, immediate family members of the victim, and the designated representatives of the victim or next of kin . . . ."  (§ 3043, subd. (d), Stats. 2004, ch. 289, § 1.)

In light of the fact that the Board is required to consider the victim's views in deciding whether to find a prisoner suitable for parole, the addition of a requirement that the Board consider the victim's views before deciding the initial date set for the next parole hearing, and before deciding whether new information or circumstances establish a reasonable likelihood the prisoner will be suitable for parole at an earlier date, does not create a significant risk of prolonging the

prisoner's incarceration. Moreover, to the extent victims provide information or argument relevant to the express issue of safety and thus suitability for parole, their participation simply provides another source of information for the Board to consider. Finally, to the extent Marsy's Law requires the Board to consider statements that may not be relevant to its decision, we assume the Board will base its decisions on appropriate grounds.

With respect to the possibility that, in some cases, the Board will be required to consider statements that are not relevant to the criteria that guide the Board's exercise of its discretion in setting the deferral period or advancing a hearing date, we note that the Board's receipt of such statements serves a purpose. One of the principal purposes of Marsy's Law is to provide victims "due process" by affording them an opportunity to be heard in proceedings concerning the prosecution, punishment, and release of those who victimized them. (Prop. 9, Findings, ¶ 1 West's Ann. Cal. Const., *supra*, at p. 9; *id.*, Purposes, ¶ 1.) Its provisions are intended to "ensur[e] that crime victims are treated with respect and dignity . . . ." (Cal. Const., art. I, § 28, subd. (a)(2).) We have recognized similar rights in the context of an individual's due process liberty interest in being free from arbitrary adjudicative procedures. (*People v. Ramirez* (1979) 25 Cal.3d 260, 264.) We noted in *Ramirez* "the important due process interest in recognizing the dignity and worth of the individual by treating him as an equal, fully participating and responsible member of society. [Citations.] 'For government to dispose of a person's significant interests without offering him a chance to be heard is to risk treating him as a nonperson, an object, rather than a respected, participating citizen.' [Citation.] Thus, even in cases in which the decision-making procedure will not alter the outcome of governmental action, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignitary values, or, in other words, 'to ensure that the method of

48

interaction itself is fair in terms of what are perceived as minimum standards of political accountability — of modes of interaction which express a collective judgment that human beings are important in their own right, and that they must be treated with understanding, respect, and even compassion.' [Citation.]" (*Id.* at pp. 267-268.) The same sentiments are evident in the provisions of Marsy's Law that seek to ensure that crime victims are treated with dignity. As in the context of adjudication of liberty interests, it is not critical that a victim's participation be relevant to the ultimate decision; rather, what is important is that the victim be acknowledged and respected. In doing so, the scheme does not authorize the Board to base its decisions on victims' opinions or public outcry.

Vicks also identifies various alleged flaws in the procedures for advancing a hearing. First, he notes that the Board requires a prisoner to provide copies of documentation in support of a petition to advance a hearing. He states that "the passage of time is itself a change in circumstances that may affect a prisoner's suitability for parole," citing *In re Lawrence, supra*, 44 Cal.4th 1181, and that "this change would be present in every case, and cannot itself be documented." The Board's form for petitioning to advance a hearing date states: "Attach a **copy** of the supporting document(s) such as support letters, job offers, and vocational or educational certificates." (Bd. Parole Hearings, Petition, *supra*, p. 1, original boldface; <http://www.cdcr.ca.gov/boph/docs/BPH_1045(A)-Petition_to_Advance_Hearing_Date.pdf> [as of Mar. 4, 2013].) The form merely informs the prisoner to provide copies rather than originals of documentation; it does not establish that a hearing cannot be advanced without documentation from the prisoner.

Second, he observes that the Board's form does not identify guidelines the Board will follow in resolving a petition, and asserts that "the Board has no standards whatsoever that it must follow in assessing a 1045(A) Petition, and

49

apparently can deny it solely because the victim or victim's next of kin objects, without regard to how the changed circumstances actually impact the sole relevant issue, whether the inmate remains dangerous." The standards applicable to the Board's assessment of a prisoner's petition are set forth in section 3041.5 and are based on long-established principles governing the Board's discretion. The Board evaluates a petition to determine whether it "set[s] forth [a] change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration . . . ." (§ 3041.5, subd. (d)(1).) Whether there is a reasonable likelihood that the prisoner is suitable for parole is evaluated by considering the suitability criteria set forth in section 3041 and the Board's regulations. (Cal. Code Regs., tit. 15, § 2281, subds. (c), (d).) As explained above, the Board applies these criteria to "attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. [Citation.] 'The [Board's] exercise of its broad discretion "involves the deliberate assessment of a wide variety of individualized factors on a case-by-case basis, and the striking of a balance between the interests of the inmate and of the public." [Citation.]' [Citation.]" (*Rosenkrantz, supra*, 29 Cal.4th at p. 655.) If the change in circumstances or new information establishes that there is no longer an evidentiary basis for concluding the prisoner is a current threat to public safety, the Board will abuse its discretion if it declines to advance the hearing date and find the prisoner suitable for parole. If, however, there is some evidence to support a conclusion that the prisoner continues to pose a threat to public safety, it is within the Board's broad discretion to decide whether the "change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration . . . ." (§ 3041.5, subd. (b)(4).)

50

Third, he notes that under the former law, when the Board deferred a hearing for five years, a deputy commissioner was required to review the prisoner's central file within three years, and could then order that the next hearing be held within one year. (§ 3041.5, former subd. (b)(2)(B); Stats. 1994, ch. 560, § 1, p. 2834.) The absence of a mandatory interim review of the prisoner's file within three years does not introduce a significant risk that a prisoner's incarceration will be prolonged. Under Marsy's Law, the prisoner has a right to bring new information or a change in circumstances to the attention of the Board any time within the first three years following the denial of parole. (§ 3041.5, subd. (d).) Thus, the new procedure allows more information to be brought to the attention of the Board within the same or a shorter period of time.

### b. Challenge to the law as applied to Vicks

In addition to his facial challenge, Vicks contends Marsy's Law violates ex post facto principles as applied to him. As noted above, *Garner* recognized that "[w]hen the [amended scheme] does not by its own terms show a significant risk, the [challenger] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier [scheme]." (*Garner, supra*, 529 U.S. at p. 255.) As explained below, Vicks has not established that Marsy's Law has created a significant risk of prolonging his incarceration.

Vicks contends that the Board's deferral of his next hearing for five years, instead of the maximum two-year deferral he would have received under prior law, reflects a "lost opportunity" to serve less time, and that such lost opportunity establishes a violation of the ex post facto clause. He cites *Weaver v. Graham, supra*, 450 U.S. 24, which held that a reduction in the rate at which the prisoner

51

accumulated credit for good behavior in prison and the addition of a means to earn discretionary credit "constrict[ed] the inmate's opportunity to earn early release, and thereby [made] more onerous the punishment for crimes committed before its enactment." (*Id.* at pp. 35-36.) In contrast to the change considered in *Weaver*, Marsy's Law did not alter the criteria for obtaining release. By reducing the frequency of hearings at the outset and allowing the advancement of a hearing date "when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner" (§ 3041.5, subd. (b)(4)), Marsy's Law affords prisoners an opportunity to have their suitability for parole considered when there is a reasonable likelihood they are suitable. Vicks does not indicate that he has requested an advanced hearing date or that there is any changed circumstance or new information that would support a conclusion that there is a reasonable likelihood he is suitable for parole. Thus, it does not appear that he has lost an opportunity to serve less time due to the longer delay before his next parole suitability hearing.

We further note that Vicks has not been prejudiced by the fact that the Board lacks discretion initially to set a hearing earlier than three years after the denial of parole. Under Marsy's Law, if the Board makes a finding by clear and convincing evidence that a deferral period of more than seven years is not required, the Board has discretion to schedule the next hearing in seven, five, or three years; there is no additional finding required to set the next hearing for three rather than five years later. (§ 3041.5, subd. (b)(3)(C).) The fact that the Board deferred Vicks's hearing for five years, despite its discretion to set the hearing for three years, establishes that it would not have exercised its discretion to set the next hearing within the time limits existing under the prior law, even if Marsy's Law afforded the Board the same discretion given Georgia's parole board.

Finally, we note that Vicks has not provided any basis to suspect that, had his next hearing been scheduled in accordance with prior law and had he been found suitable for parole at that earlier hearing, he would have been released on parole. Vicks began serving his life term on March 13, 2003. In light of the circumstances of his kidnapping offenses, such as the movement of the victims, the sexual assaults, and the use of a firearm, it appears under the matrices governing the calculation of his base term that he would be required to remain incarcerated even if he were found suitable for parole at this time. (See Cal. Code Regs., tit. 15, §§ 2282-2288.)

Vicks and amicus curiae, the Public Defender for the Eastern District of California, seek to expand the challenge in this case to encompass a claim that Marsy's Law violates ex post facto principles as applied to life prisoners whose commitment offenses occurred before the passage of Marsy's Law. Vicks cites an article reporting a study of 211 parole hearings held during the period from 2007 to 2010. (Richardson, Impact of Marsy's Law on Parole in California: An Empirical Study (May 16, 2011), available online at <http://ssrn.com/abstract=1878594> [as of Mar. 4, 2013].) He does not address the basis on which a court might grant judicial notice of the contents of the article. In any event, the conclusions cited concerning the increase that has occurred in the average time between the denial of parole and the date set for the next parole hearing merely reflect the fact that Marsy's Law mandates lengthier deferrals at the time parole is denied; these conclusions do not reflect that prisoners are being denied parole hearings when there is a reasonable probability they will be suitable for parole.

The federal public defender, joined by Vicks, has requested that this court grant judicial notice of four volumes of evidence presented in a class action brought on behalf of life prisoners whose commitment offenses occurred before

53

the passage of Marsy's Law. (*Gilman v. Brown* (E.D.Cal. Sept. 7, 2012, CIV. No. S-05-830 LKK/GGH) 2012 U.S.Dist. Lexis 127679.) The proffered evidence was presented at an evidentiary hearing in April 2011, and generally concerns the Board's processing of prisoner requests to advance parole hearings, and statistics related to the advancement of parole hearings and the granting or denial of parole. The evidence also includes data concerning (1) the rate at which prisoners received parole dates following this court's decision in *In re Lawrence, supra*, 44 Cal.4th 1181, which explained that the modicum of evidence required to support a denial of parole must establish not only that the commitment offense was particularly egregious, but also that the prisoner currently is dangerous, and (2) the results of parole hearings following the stipulation in *In re Rutherford* (Super Ct. Marin County, 2006, No. SC135399A), that those prisoners whose parole suitability hearings were overdue on December 15, 2008, were entitled to have their parole hearings conducted under the pre-Marsy's Law statutory guidelines. The public defender contends that "the evidence shows without doubt that the result of the [Marsy's Law] deferral periods has been to create not only a significant risk of increased incarceration for life prisoners but a certainty of increased incarceration for many of them."

We deny the request for judicial notice for two reasons. First, most of the records are not subject to judicial notice for the purposes they are offered. The public defender proposes that the transcript of the evidentiary hearing and the 41 exhibits admitted into evidence at the hearing are subject to judicial notice under Evidence Code section 452, subdivision (d), which authorizes judicial notice of court records. "The court may in its discretion take judicial notice of any court record in the United States. [Citation.] This includes any orders, findings of facts and conclusions of law, and judgments within court records. [Citations.] However, while courts are free to take judicial notice of the *existence* of each

54

document in a court file, including the truth of results reached, they may not take judicial notice of the truth of hearsay statements in decisions and court files." (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.)  Here, judicial notice of the contents of the transcript and exhibits is sought.

Second, the evidence the public defender has assembled reflects only the beginning of the factfinding process required to determine the impact of Marsy's Law as applied to prisoners generally.  The federal court in the *Gilman* litigation has appointed a statistician to analyze the evidence, has ordered the plaintiffs to present additional evidence beyond the evidence presented at the April 2011 evidentiary hearing, and has ordered the defendants to produce certain information about parole decisions in the years 1991 through 2008.  According to the Attorney General, the federal court has made no findings concerning the evidence presented in that case.  Thus, even if some of the documents obtained from the Board might be subject to judicial notice under Evidence Code section 452, subdivision (c), as official acts of an executive agency, such documents are not properly considered in isolation and do not establish facts that would allow resolution of the contention that Marsy's Law has, as applied, prolonged prisoners' incarceration.

Therefore, we decline to consider evidence of the effect of the changes in parole procedures on prisoners in general, and we decline the request of Vicks and amicus curiae to expand the issues in this proceeding to address whether Marsy's Law violates ex post facto principles as applied to life prisoners whose commitment offenses occurred before the passage of Marsy's Law.

**D.  Was Marsy's Law intended to increase punishment?**

Independent of Vicks's contention that Marsy's Law creates a significant risk of prolonging a prisoner's incarceration, he also contends that Marsy's Law

was *intended* to increase punishment, and for that reason alone violates the ex post facto clause. We disagree, for two reasons. First, the authority Vicks cites in support of the proposition that an intention to increase punishment is, by itself, sufficient to establish a violation of the ex post facto clause, is inapposite. Second, none of the provisions of Marsy's Law reflects an intent to deny inmates a parole date when they are suitable for parole.

Vicks cites *Smith v. Doe* (2003) 538 U.S. 84 in support of his view that intent alone will establish an ex post facto violation. *Smith* considered whether a sex offender registration requirement violated the ex post facto clause when applied to sex offenders who had committed their offenses prior to the enactment of the registration requirement. Resolution of the issue required a determination of whether the registration law was civil or criminal. The court observed that "[i]f the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is ' "so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil." ' [Citation.]" (*Id*. at p. 92.) Thus, if the legislature intended the new registration statute to be punitive rather than regulatory, the statute was criminal, and its imposition upon one whose crime was committed prior to the statute's enactment constituted additional punishment. It was in this context that the court observed that "[a] conclusion that the legislature intended to punish would satisfy an *ex post facto* challenge without further inquiry into its effects . . . ." (*Id*. at pp. 92-93.) *Smith* did not address the issue of whether an intent to increase punishment, by itself, constitutes a violation of ex post facto principles, and Vicks has cited no case holding that such an intent violates ex post facto principles. (See also *Garner, supra*, 529 U.S. at p. 262 (dis. opn. of Souter, J.) [acknowledging that

56

"we have never decided that a purpose to increase punishment, absent a punitive effect, itself invalidates a retroactive policy change"].)

Even if an intent to increase punishment were sufficient to establish a violation of the ex post facto clause, the terms of Marsy's Law do not evince an intent to increase punishment or to deny inmates parole. The measure's Findings and its statement of purposes reflect that the Law's principal goals are to grant victims of crime the rights to notice and to be heard in the criminal process; to promote adequate funding of the justice system so that criminals will be prosecuted and punished in a manner that is timely and commensurate with their crimes; and to spare victims the ordeal and taxpayers the expense of parole hearings when there is no current likelihood that the prisoner will be paroled. (Prop. 9, West's Ann. Cal. Const., *supra*, at p. 9.) Its references to inadequate incarceration relate to issues other than parole, such as an asserted failure to build adequate jails and prisons and to effectively prosecute and sentence criminals. (*Id*., Findings, ¶ 4.) Similarly, its references to "the right to an expeditious and just punishment" (*id*., ¶ 1) and to the "failure to impose actual and just punishment" (*id*., ¶ 9) appear to relate to funding and functioning of the criminal justice system which, it states, "has failed to expeditiously finalize the sentences and punishments of criminal wrongdoers. Those criminal wrongdoers are being released from custody after serving as little as 10 percent of the sentences imposed and determined to be appropriate by judges." (*Id*., ¶ 4.) This construction is supported by the fact that statements that expressly address parole focus on the impact that frequent parole hearings have on victims, and on the measure's intent to eliminate hearings at which there is no likelihood that the prisoner will be found suitable for parole. None of the statements expressly addressing parole indicates a desire to extend incarceration despite a prisoner's suitability for parole. (*Id*., ¶¶ 5, 6, 8; *id*., Purposes, ¶ 2.) Finally, the stated intent "to provide that a convicted

57

murderer can receive a parole hearing no more frequently than every three years, and can be denied a follow-up parole hearing for as long as 15 years" (*id.*, Purposes, ¶ 2) merely states in general terms the change to parole procedures proposed by the voter initiative, and does not reflect an intent to deny parole to any prisoner who is suitable for parole under the law.

The provisions that Marsy's Law added to the state Constitution concerning "the expectation" that criminals will be "tried . . . , sentenced, and sufficiently punished" (Cal. Const., art. I, § 28, subd. (a)(4)) and the "right to expect that persons convicted of committing criminal acts are sufficiently punished in both the manner and the length of the sentences imposed" (*id*., art. I, § 28, subd. (a)(5)) appear to relate to the enforcement of the Penal Code, the sentence imposed and the stated concern that inadequate prison capacity and ineffective prosecutions result in insufficient punishment. This relationship is apparent in section 28, subdivision (a)(5)'s reference to "the manner and the length of the sentences imposed," and is also reflected in the fact that the expectations set forth in section 28, subdivision (a)(4) parallel the concerns expressed in the measure's Findings regarding asserted failures in the criminal justice system with respect to prison capacity and prosecutions. (See Prop. 9, Findings, ¶ 4, West's Ann. Cal. Const., *supra*, at p. 9.)

In contrast, perceived flaws in the parole process are addressed in a different subpart of subdivision (a) (see Cal. Const., art. I, § 28, subd. (a)(6)), and the concerns and proposed solutions that are related to parole procedures are silent with respect to the sufficiency of punishment. Instead, the statements addressing parole focus on the impact of frequent parole hearings on victims, an impact that results from a system that affords multiple hearings during a period in which the prisoner is not suitable for parole. Thus, the concerns and solutions related to parole are directed to reducing the number and frequency of hearings at which

58

parole is denied rather than extending the incarceration of prisoners who are suitable for parole.

Vicks also contends that the statutory amendments, which create "hurdles and obstacles for parole eligible life term inmates" by lengthening the default deferral period to 15 years and the minimum deferral period to three years, demonstrate that Marsy's Law is "vindictive legislation." To the extent the changes intentionally and actually result in less frequent parole hearings, these aspects reflect the law's stated intent to spare victims of crime and taxpayers the burden of parole hearings at which there is no reasonable likelihood that the prisoner will be found suitable for parole. That the changes limit the frequency of parole hearings does not reflect an intent to increase punishment or to prolong incarceration beyond the time when a prisoner is suitable for parole.

### III. CONCLUSION

For the reasons set forth above, we conclude that the changes to the parole process effected by Marsy's Law do not, on their face, create a significant risk that life prisoners' incarceration will be prolonged. We also reject Vicks's contention that Marsy's Law is invalid as applied to him. Finally, we decline to undertake an analysis of whether Marsy's Law violates ex post facto principles as it is being applied to life prisoners whose commitment offenses occurred before the passage

59

of Marsy's Law; Vicks did not raise this contention below, and the evidence of which he seeks judicial notice does not provide a basis for this court to address the issue.

The judgment of the Court of Appeal is reversed to the extent it vacates the Board's order deferring Vicks's next parole hearing in accordance with the terms of Marsy's Law.  In all other respects, the judgment is affirmed.

CANTIL-SAKAUYE, C. J.


WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY LIU, J.**


I join the court's opinion and write separately to underscore the limited nature of our holding.

Petitioner's primary claim is a facial challenge to the application of Marsy's Law to prisoners who committed their crimes before the law was enacted. Petitioner also contends that the statute violates the ex post facto clauses of the federal and state Constitutions as applied to him. Whether the challenge is on its face or as applied, the United States Supreme Court has held that the relevant inquiry is not whether differences exist between the prior parole system and the current system, but "whether the amended [statute] creates a significant risk of prolonging [the prisoner's] incarceration." (*Garner v. Jones* (2000) 529 U.S. 244, 251.) On a facial challenge, the *Garner* inquiry requires that this "significant risk" be "inherent in the framework" of the amended schedule. (*Id.* at p. 251.) Where the statute in question provides the parole board with some discretion, the *Garner* standard by its nature permits — in fact, requires — the reviewing court to speculate about possible safety valves consistent with the statutory scheme that might mitigate any significant risk of prolonged incarceration.

Applying this rule, the court today concludes that Marsy's Law on its face does not create a significant risk of prolonged incarceration. In reaching this conclusion, the court speculates on a variety of ways that the Board of Parole Hearings (Board) *may* exercise its discretion to mitigate the risk of prolonged

1

incarceration.  For example, the court says the Board "may" exercise its discretion by directing its staff to conduct interim internal reviews when it believes an inmate might become parole eligible before his or her next scheduled hearing.  (See, e.g., maj. opn., *ante*, at pp. 36, 39, 42.)  The court also says that if something changes to affect an inmate's parole eligibility during a period in which he or she is barred from submitting a petition for an advanced hearing, the inmate "may" convey the information to the Board outside of a formal petition.  (*Id.* at p. 38, fn. 17.)  Further, the court says the Board "may" direct staff to conduct an internal review upon receipt of any such information.  (*Id.* at p. 37.)

All of these possibilities are highly speculative.  But they appear to be within the Board's authority and discretion, and together they weigh against a finding that a significant risk of prolonged incarceration is *inherent* in Marsy's Law.  However, the fact that these speculative actions *may* occur does not imply that they *do* occur in practice.  The Attorney General stated at argument that she was not aware of any Board policy or practice of exercising its authority to advance a hearing or to direct staff to monitor or internally review parole eligibility.  Today's opinion acknowledges that no such policy or practice appears in the record before us.  (See maj. opn., *ante*, at p. 35.)

The court also notes that the risk of prolonged incarceration is further mitigated by the fact that many of the factors affecting parole suitability are not "amenable to rapid change."  (Maj. opn., *ante*, at pp. 38, 42, 43.)  I understand this to mean it is possible, even if speculative, that the immutability of some parole factors (e.g., the circumstances of the crime, the inmate's criminal record, and other factors concerning the inmate's history), together with the posited discretion of the Board to respond to factors that may change over time (e.g., a prisoner's insight into his crime, his activities in prison, his parole plans), suggests that Marsy's Law does not inherently create a significant risk of prolonged

2

incarceration.  However, we have no facts before us to determine, one way or another, how rapidly the suitability factors that *are* amenable to change actually do change, or whether the Board actually exercises its discretion to respond to such changes.

With these observations, I join the court's limited holding that Marsy's Law does not violate the ex post facto clauses on its face or as applied to petitioner.


LIU, J.

I CONCUR:  WERDEGAR, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Vicks

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 195 Cal.App.4th 475
**Rehearing Granted**

_____

**Opinion No.** S194129
**Date Filed:** March 4, 2013

_____

**Court:** Superior
**County:** San Diego
**Judge:** David M. Gill

_____

**Counsel:**

Steven M. Defilippis, under appointment by the Supreme Court, for Petitioner Michael Vicks.

Daniel Broderick, Federal Defender, and Monica Knox, Assistant Federal Defender, as Amici Curiae on behalf of Petitioner Michael Vicks.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Donald E. de Nicola, Deputy State Solicitor General, Julie L. Garland and Jennifer A. Neill, Assistant Attorneys General, Anya M. Binsacca, Phillip Lindsay and Jennifer Gwen Ross, Deputy Attorneys General, for Respondent The People.

W. Scott Thorpe; Bonnie M. Dumanis, District Attorney (San Diego), Richard J. Sachs, Deputy District Attorney; and Albert C. Locher, Assistant District Attorney (Sacramento), for California District Attorneys Association as Amicus Curiae on behalf of Respondent The People.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Steven M. Defilippis
Picone & Defilippis
625 N. First Street
San Jose, CA  95112
(408) 292-0441

Jennifer Gwen Ross
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5774