Filed 6/26/24  P. v. Ireland CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061095 |
| v. | (Super. Ct. No. 17WF0007) |
| CHRISTOPHER KEN IRELAND, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

A jury convicted Christopher Ken Ireland of two counts of first degree murder (Pen. Code, § 187, subd. (a)) and one count of arson of an inhabited dwelling (*id.*, § 451, subd. (b)). The jury found to be true a multiple murder special circumstance allegation. (*Id.*, § 190.2, subd. (a)(3).) The trial court sentenced Ireland to a prison term of life without the possibility of parole on the murder convictions and a consecutive term of five years on the arson conviction.

Ireland seeks reversal based on the following contentions: (1) The trial court erred by denying his motions for mistrial which were based on two separate instances of spectator misconduct; (2) the trial court erred by denying his request to exclude from trial the two spectators who had engaged in the first instance of misconduct; (3) the trial court erred by allowing impermissible character evidence and by denying his third motion for mistrial, which was based on that evidence.

We affirm. We conclude the trial court did not err by denying Ireland's motions for mistrial based on spectator misconduct. Admonitions to the jurors and their promises to follow those admonitions cured any potential prejudice. The trial court, having received assurances from the offending spectators that they would maintain decorum, did not err by denying Ireland's request to exclude them. The trial court did not err by denying Ireland's third motion for mistrial: The trial court ordered the erroneously admitted evidence to be stricken, and the court's admonition to the jurors not to consider the evidence cured any possible prejudice.

FACTS

I. *Ireland Murders Yolanda and Michelle*

On December 31, 2016, Yolanda Holtrey (Yolanda)[1] hosted a New Year's Eve party at her home in Westminster. A small group of friends and acquaintances were guests at Yolanda's party. The guests included Michelle Luke, C.M., Ireland, his wife, and their 10-year-old son. Yolanda, Michelle, and Ireland's wife knew each other because they worked at the same retail store. As of 9:27 p.m., when C.M. arrived, Michelle appeared to be drunk. Over the next several hours, the partygoers drank and had a good time. Michelle acted flirtatiously with Ireland and danced sexily and provocatively.

C.M. left the party at around 12:30 a.m. on January 1. She was the first to leave. Ireland's wife and her son left the party at 1:20 a.m. on January 1. At some point soon after they left, Ireland had sex with Michelle according to a prearranged plan.

Sometime between 1:23 a.m. and 1:32 a.m., on January 1, Ireland killed Yolanda. He brutally beat her, stabbed her in the chest five to eight times, in the neck three to eight times, and strangled her. She suffered severe blunt force trauma to her forehead and chin, a torn upper inner lip, and a broken nose. Her jugular vein was nicked, her carotid artery was severed, and her epiglottis transected. Yolanda was 59 years old.

Once Yolanda stopped moving, Ireland walked outside to get away but decided to return because he was in disbelief and "had to check to see what really happened." At about 1:32 a.m., Ireland stepped through the front door, walked to the end of the entryway, looked down the street,

---

[1] We use first names to avoid confusion, and not out of disrespect.

3

returned to the home, pushed open the front door, stepped inside, and tripped over Yolanda's body.

Soon after walking back into the house, Ireland killed Michelle with equal brutality. He beat her and, using the same knife he used to kill Yolanda, stabbed Michelle with great force seven times in the right side of her face. The longest knife incision extended from Michelle's right ear to the back of her neck and towards her spinal column. Michelle had bruising around her left eye, nose, and forehead, and had two black eyes and a broken nose. Michelle was 49 years old.

II. *Ireland Disposes of the Bodies*

Ireland drove home. He returned to Yolanda's house at 3:00 a.m. and tried to clean up the scene. Ireland wrapped Yolanda's body and Michelle's body in sheets and towels and, at about 4:30 a.m., placed them in the trunk of his car, which he had lined with sheets. He went back inside the house, cleaned up some more, and removed the computer equipment connected to the surveillance system. At about 5:05 a.m., just before leaving, Ireland started fires in the home using vodka and rum as accelerants.

Ireland drove to a secluded spot off Ford Road in Newport Beach. He removed the bodies from his car and dragged them, one at a time, as far he could. He placed the bodies side-by-side face down, covered them with a blanket, and placed branches over the blanket. Ireland then drove to a church where he dumped "[e]verything that was dirty" and "whatever [he] had left in the car," including the knife he had used to stab Yolanda and Michelle. From the church, Ireland drove home. Later that morning he had his car washed.

4

III. *Firefighters and Police Investigators Respond*

On January 1 at around 1:30 a.m., a tenant who rented a room from Yolanda returned home and went to his room through a separate entrance. At around 5:15 a.m., he awakened to the smell of smoke. He dialed 911.

Firefighters arrived and by 5:53 a.m. had put out the fire. Another tenant, who had returned home at 3:00 a.m., was awakened by the activity of the firefighters and walked out to the street. Fire investigators, assisted by an accelerant detection K-9, determined that two fires, spaced 28 feet apart, had been set inside the home.

Later that morning, police investigators arrived. Yolanda and Michelle could not be found and were considered to be missing persons.

At 1:15 p.m. on January 1, Ireland, his wife, and their son drove back to Yolanda's house. Ireland told a police investigator that when he left the house, Michelle was asleep or passed out on one couch and Yolanda was passed out on another couch. Ireland said he arrived home at 2:00 a.m. and did not leave until 8:30 a.m.

Westminster police investigators spoke with Ireland in four sessions over the course of several hours. Ireland at first maintained that Yolanda and Michelle were alive when he left the party. He denied going back to the house or knowing what had happened to them. Toward the end of the fourth session, Ireland said he had "some sort of vision" of exiting off the 73 freeway at some time the previous morning. He drew a picture of the freeway exit ramp with an arrow representing the direction in which he exited. Using the picture drawn by Ireland, police investigators were able to locate the bodies of Yolanda and Michelle at the end of Ford Road, east of a paved area beyond an access road closed to the public.

5

DISCUSSION

I. *The Trial Court Did Not Err by Denying Ireland's Motions for Mistrial Based on Spectator Misconduct*

A. The Motions for Mistrial

Ireland contends the trial court erred by denying his two motions for mistrial, which were based on two instances of spectator misconduct. The first instance of spectator misconduct occurred during the prosecutor's examination of the forensic pathologist who conducted autopsies on the corpses. As the prosecutor asked the pathologist about a photograph of Yolanda's corpse taken during the autopsy, a spectator interjected by yelling, "Fuck." Another spectator yelled: "Fucking piece of shit. You're a piece of shit, bitch. You're a fucking piece of shit. You like representing shit like that? You like representing shit like that? [¶] You fucking nasty mother fucker." The two spectators later were identified as F.G. (Yolanda's son) and H.H. (Yolanda's daughter).

Although the court described the outburst on the previous day as "serious," "surprising," and "profane," the court found nothing about the outburst led the court to find the jury would be intimidated by the spectators' conduct. Based on the jurors' answers to voir dire questions, and the court's continual observation of the jurors demeanor throughout the trial, the court concluded it did "not believe that what happened yesterday would cause the jurors to disregard the instruction that I gave them" and did "not believe that there is anything that happened yesterday or throughout this trial that . . . causes me to question whether or not they could render a fair trial to the defendant."

6

The second instance of spectator misconduct occurred during closing argument. While reviewing the verdict forms, defense counsel stated: "So here's what I'm asking, you know, to sum up. You're going to do your job. And it's going to be a hard job. But here's what I'm asking, vote guilty on first degree—vote not guilty on first degree murder because." At that moment, an audience member said: "Guilty. You said it right."

The trial court immediately interrupted the argument, called a recess, and instructed the jurors to disregard anything said or done by audience members. H.H. and Yolanda's sister identified themselves as the ones who had made the outburst. The court ordered them to leave the courtroom and barred them from the rest of the trial. The court stated: "This court has taken every action to ensure that this trial proceed in a ready and speedy process, and your actions have risked this case being discontinued and derailed."

Ireland's counsel again moved for a mistrial. The trial court denied the motion for mistrial. The court found, among other things, "In this case, a spectator who blurts out the word, 'guilty,' even in light of the prior outburst is not the type of conduct that the court believes would prejudice or influence this jury or in any way does the court believe it would increase any pressure on this jury to reach any particular verdict."

B. Relevant Law

A mistrial based on spectator misconduct not attributable to any party is warranted only if the misconduct is "'of such a character as to prejudice the defendant or influence the verdict.'" (*People v. Chatman* (2006) 38 Cal.4th 344, 368-369 (*Chatman*).) Spectator conduct of such character is likewise ground for reversal of the judgment on appeal. (*People v. Myles*

7

(2012) 53 Cal.4th 1181, 1215.)  Spectator misconduct violates federal constitutional standards if the misconduct is "'so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial. . . .'" (*Chatman,* at p. 369.)

We review an order denying a motion for a mistrial under the abuse of discretion standard.  (*People v. Collins* (2010) 49 Cal.4th 175, 198.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Wilson* (2021) 11 Cal.5th 259, 304.)

"'[B]ecause a spectator does not wear the same cloak of official authority as a prosecutor, most instances of spectator misconduct will likely be more easily curable than those of a prosecutor.'"  (*Chatman, supra*, 38 Cal.4th at p. 369.)  In cases of spectator misconduct, ""'prejudice is not presumed"'" and ""'it is generally assumed that such errors are cured by admonition, unless the record demonstrates the misconduct resulted in a miscarriage of justice."'"  (*Ibid*.)  ""'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonitions or instruction."'" (*People v. Silveira and Travis* (2020) 10 Cal.5th 195, 298.)

C.  Admonitions and Preventative Measures Cured Any Prejudice

The two instances of spectator misconduct in this case were quite serious indeed.[2]  The trial court found the first outbursts to be "serious,"

_____

[2] When making the first motion for mistrial, defense counsel claimed other profanities had been directed at her and Ireland and, during the previous week, other spectators had made gasps and other noises.  The

8

"surprising," and "profane" and recognized that it had never presided over a trial in which there were two such instances of spectator misconduct.

But the trial court responded swiftly, decisively, and appropriately to both instances of spectator misconduct. After the first instance, the trial court immediately interrupted the testimony, admonished the jury to disregard anything said by a spectator, excused the jury, and called a recess. Outside the jury's presence, the court told the spectators it would not tolerate further outbursts. The court admonished the jury again before excusing them for the day.

The trial court listened to counsel's respective recollection of events and then denied the motion for mistrial. The court questioned F.G. and H.H. and ordered them not to display agreement or disagreement with testimony, not to have any type of oral or physical outburst, and not to do anything that might draw attention to themselves or anyone else in the courtroom. Both F.G. and H.H. assured the court they would and could comply with the court's order. The trial court again admonished the jurors not to consider or discuss the outburst from the previous day. The court polled the jurors and every juror responded yes to the question of whether they could follow that rule. (See *People v. Rhoades* (2019) 8 Cal.5th 393, 422 (*Rhoades*) [trial court polled jurors twice to ensure spectator misconduct would not influence their decision].)

---

trial court stated on the record it did not hear those other profanities, gasps, and noises and "nothing that happened last week was at all similar to what happened yesterday." Ireland cites to nothing in the record to counter the trial court's findings.

After the second instance of spectator misconduct, the trial court immediately called a recess after admonishing the jurors not to consider anything they had heard from the audience. The court ordered H.H. and Yolanda's sister to leave the courtroom immediately. The court admonished the audience members to control their behavior. When the jurors returned, the trial court again instructed them to disregard anything they heard from the audience. When the jurors were asked whether they could follow that rule, every juror replied yes.

The admonitions given to the jurors and spectators in this case were similar to or even more forceful than those given to the juries in *Chatman*, *supra*, 38 Cal.4th 344, *Rhoades, supra*, 8 Cal.5th 393, *People v. Lucero* (1988) 44 Cal.3d 1006, and *People v. Carrasco* (2014) 59 Cal.4th 924. In those cases, the California Supreme Court concluded that immediate admonitions to jurors and spectators cured any potential prejudice from the spectator misconduct. We presume the jurors followed admonitions given to them (*People v. Allen* (1978) 77 Cal.App.3d 924, 934), and that the admonitions cured spectator misconduct (*Chatman,* at p. 369). This is not the "'exceptional case'" in which an admonition could not cure potential prejudice. (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1429.)

In addition, the trial court expressly found the admonitions would cure the two instances of spectator misconduct. The court stated on the record that given the jurors' answers to voir dire questions and demeanor throughout the proceedings, there was nothing to suggest they would disregard admonitions or decline to afford Ireland a fair trial. When denying the second motion for mistrial, the trial court found that the jurors had "time and time again" been instructed on what they could consider in reaching a verdict and that any prejudice from the spectator misconduct could be

10

corrected by admonishment.  The trial court, as the trial court in *Rhoades*, *supra*, 8 Cal.5th at pages 421-422, twice polled the jurors and twice received assurances they would obey the court's order to disregard the spectator outbursts.  The trial court, having observed the jurors throughout the trial, was in the better position to assess their sincerity and ability to follow its directives.

Ireland argues the spectator misconduct in this case was intended to and would intimidate and bully the jurors.  The trial court found nothing about the first outburst that would intimidate the jury and nothing that would cause the court to question whether Ireland would receive a fair trial.  When denying the second motion for mistrial, the trial court found that nothing about the outbursts would "in any way increase[] pressure on this jury to reach verdicts . . . other than based upon the facts and the law."  The trial court, having watched the jurors, would know whether or not the outbursts would intimidate them.

Even though the court did not believe the spectator misconduct would intimidate the defense team or the jury, it put preventative measures in place after denying the first motion for mistrial.  The court ordered that a divider be placed in one aisle to block audience members from moving toward the trial participants and chairs be placed in the other aisle to block audience members from sitting behind the defense paralegals.  The court did not permit spectators to sit anywhere near the defense paralegals and ordered that extra sheriff deputies remain in the audience portion of the courtroom to help avoid future disruptions.  The trial court thus "went to great lengths to ensure proper courtroom decorum from the spectators."  (*People v. Carrasco, supra*, 59 Cal.4th at p. 965.)

11

The spectator misconduct in the present case provided the jury with no information except for the hostility of F.G, H.H., and Yolanda's sister, "which would not have been surprising in itself," and for their "inability to maintain the decorum of the courtroom." (*Rhoades, supra*, 8 Cal.5th at p. 422.) The trial court expressly found the outbursts did not provide the jurors "any new or impermissible information." (See *Chatman, supra*, 38 Cal.4th at p. 369 [spectator misconduct "provided the jury with no significant information it did not already know or might not readily surmise. Even without observing [the mother] in person, any reasonable juror would know that the crime had caused the victim's family anguish"].)

Despite the trial court's prompt and repeated admonitions to the jurors and the audience, the trial court's assessment of the effect of those admonitions, the preventative measures taken, and the trial court's finding of lack of prejudice, Ireland maintains the two instances of misconduct were so prejudicial as to require a mistrial. We disagree. The trial court was in the best position to undertake the "nuanced, fact-based analysis" of whether the spectator misconduct was so prejudicial as to warrant a mistrial. (*Chatman, supra*, 38 Cal.4th at p. 370.) The spectator misconduct in this case was not "'so inherently prejudicial" as to violate Ireland's constitutional rights (*id.* at p. 369), and the record demonstrates the trial court took steps to ensure Ireland received a fair trial.

II. *The Trial Court Did Not Err by Denying Ireland's Request to Remove F.G. and H.H. from the Courtroom*

After the trial court denied the first motion for mistrial, Ireland requested that F.G. and H.H. be excluded from the courtroom for the remainder of trial. Ireland argued the court erred by denying his request.

After Ireland's counsel requested their exclusion, the trial court had F.G. and H.H. brought back into the courtroom. The court admonished them and told them, in no uncertain terms, their conduct placed the integrity of the trial at risk. The court told them if they were allowed to stay in the courtroom, they would be subject to an order "not to display agreement or disagreement with testimony, not to have any type of oral or physical outburst, and not to do anything that might draw attention to himself or anyone else in this courtroom." F.G. was asked if he could follow that order. He answered: "Yes. Yes, I can."

The court asked H.H. if she could control her behavior. She replied: "As I told my family and the people that are representing me, I already apologized to them, and I apologize to the court. This will not happen again. We will have our composure. Our family has now said our peace. He knows we're here. And that's it." When asked if she could follow the court's order, H.H. replied, "I understand, and I will comply 100 percent from here on forward." The court decided to allow both F.G. and H.H. to return to court, subject to the court's order.

In deciding whether to have spectators removed from a trial, a trial court must consider two important policies. First, the federal and state Constitutions guarantee every person charged with a crime the right to a public trial. (U.S. Const., 4th & 5th Amends; Cal. Const., art. I, § 15.) "The right to an open public trial is not the right of only the criminal defendant, but is rather a shared right of the accused and the public, the common concern being the assurance of fairness." (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552.) Second, "the right to [a public] trial [might have to] give way in certain cases to other rights or interest, such as the defendant's right to a fair trial . . . ." (*Waller v. Georgia* (1984) 467 U.S. 39, 45.) "Such

13

circumstances will be rare, however, and the balance of interests must be struck with special care." (*Ibid.*)

Exclusion may be a total closure in which no spectators are permitted inside the courtroom or a partial closure in which some but not all spectators are not permitted or asked to leave. (*People v. Esquibel, supra*, 166 Cal.App.4th at p. 552.) "In the case of a partial closure, the Sixth Amendment public trial guarantee creates a "'presumption of openness'" that can be rebutted only by a showing that exclusion of the public was necessary to protect some "'higher value'" such as the defendant's right to a fair trial, or the government's interest in preserving the confidentiality of the proceedings." (*Ibid.*)

In addition, California law grants crime victims the right to be present at all public proceedings at which the defendant and the prosecutor are entitled to be present. (Cal. Const., art. I, § 28, subd. (b)(7); see *In re Vicks* (2013) 56 Cal.4th 274, 283.) Under Penal Code section 1102.6 "a victim shall be entitled to be present and seated at all criminal proceedings where the defendant, the prosecuting attorney, and the general public are entitled to be present." (*Id.*, subd. (a).) If the victim is dead, the word "victim" includes "two members of the victim's immediate family." (*Id.*, subd. (c).) To have a victim excluded from a criminal proceeding, the party seeking exclusion must demonstrate "there is a substantial probability that overriding interests will be prejudiced by the presence of the victim." (*Id.*, subd. (b)(1).) Such overriding interests include "[t]he defendant's right to a fair trial" (*id.*, subd. (b)(1)(A)) and "[t]he court's interest in maintaining order" (*id.*, subd. (b)(1)(D)).

14

As Yolanda's children, F.G. and H.H. were victims under Penal Code section 1102.6 and therefore had a right to be present at trial. In response to the trial court's firm admonishment, both F.G. and H.H. assured the court they would and could comply with its order to maintain decorum.

The trial court was in the best position to assess the honesty and credibility of F.G. and H.H. and make the decision whether to curtail their constitutional right to be present at trial. The trial court accepted their assurances as truthful. We have no reason to second guess the court's decision. Indeed, defense counsel believed F.G. to have been "reflective and contrite" and did not ask that he be removed. Because the trial court admonished F.G. and H.H. and obtained their promises not to again disrupt the trial, the court could justifiably believe there was not a substantial probability that Ireland's overriding interest in a fair trial would be prejudiced by their presence in the courtroom.

Ireland argues H.H.'s statements that "[o]ur family has now said our peace" and "[h]e knows we're here" indicate H.H. was not being truthful and had acted according to a prearranged plan to disrupt the trial. Drawing inferences in favor of the trial court's ruling (*People v. Stansbury* (1995) 9 Cal.4th 824, 831), we conclude those statements would have indicated that H.H., having said her peace and informed Ireland of her family's presence, would behave appropriately for the rest of trial. Although, as it turned out, H.H. disobeyed the trial court's instruction to maintain decorum, the court's ruling is reviewed for abuse of discretion based on the facts as they appeared when the court made its ruling. (*People v. Avila* (2006) 38 Cal.4th 491, 575; see *People v. Welch* (1999) 20 Cal.4th 701, 739.)

15

III. *The Trial Court Did Not Err by Denying Ireland's Motion for a Mistrial Based on Evidentiary Error*

Ireland argues the trial court erred and violated his right to due process by permitting the prosecution to present inadmissible character evidence consisting of a photograph of items from a container found in Ireland's apartment and testimony relating to that photograph. He also argues the trial court erred by denying his motion for a mistrial that was based on the character evidence.

A detective who executed the search warrant at Ireland's apartment testified that during the search he found a closed container containing pantyhose, a book on lock picking,[3] handcuffs, a handcuff key, some knives, and batting gloves. The prosecutor marked as exhibit 39 a photograph of the contents of the container and published the photograph to the jury. At the prosecution's request, the court allowed to be marked for identification exhibit 40 (four photographs of the contents of the container) and exhibit 41 (a photograph of a closer view of the contents of the container). The court otherwise sustained Ireland's objections to exhibits 40 and 41.

The prosecutor asked the detective what items in the closed container did he view as being potentially significant to the investigation. The detective answered: "The totality of all these items in the box being kept together in a box that was contained altogether, I guess."

When the prosecutor again asked about the book on lock picking, Ireland's counsel objected, and the court called a recess and ordered that

---

[3] The prosecution's exhibit list describes exhibit 39 as "[p]hoto of a case containing items including panty hose [*sic*], lock picking kit, handcuffs and knife." The detective testified the container held a "lock picking kit." However, the trial court described exhibit 39 as a photograph of a black case containing "a lock picking guide" and both the prosecutor and defense counsel referred to the item as "a book on lock picking" or a "lock picking book."

exhibit 39 be removed from the display.  The trial court concluded evidence of the book on lock picking was inadmissible character evidence and sustained the defense objection to the question regarding that book.

Ireland's counsel formally objected to exhibit 39 and moved for a mistrial on the ground the jury had seen exhibit 39 and heard testimony regarding it.  The trial court denied the motion for a mistrial.  The court concluded that none of items found in the closed container, except for possibly the batting gloves, were relevant.  The court found, however, the jury would not be "improperly swayed" by the evidence regarding the closed container and its contents.  The court instructed the jury as follows:  "The evidence of the other items in that black case should not be received into evidence, and at this time I am ordering evidence of everything that was in that black case, other than the black gloves, be stricken, and you are ordered to disregard it and not consider it for any purpose.  [¶]  That means when you are asked to begin your deliberations, not only can you not consider that evidence for any reason, you can't even discuss it amongst yourselves."  The court polled the jurors individually, and all confirmed they could follow the court's instruction.

Whether the erroneous admission of evidence warrants granting a mistrial or whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court.  (*People v. McLain* (1988) 46 Cal.3d 97, 113.)  As in the case of spectator misconduct, a mistrial for erroneous admission of evidence should be granted only "if the court is apprised of prejudice that it judges incurable by admonition or instruction."  (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)  "A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith.  [Citations.]  It is only in

17

the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.'" (*People v. Allen, supra,* 77 Cal.App.3d at pp. 934-935.) Erroneous admission of evidence does not amount to a violation of due process unless the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" (*Dowling v. United States* (1990) 493 U.S. 342, 352.)

Here, the trial court acknowledged the evidence of the contents of the closed container (except for the batting gloves) was inadmissible. The court ordered that evidence—which included exhibit 39 and some testimony by the detective—be stricken. The court admonished the jury not to consider that evidence for any purpose and not to discuss it. Every juror promised to follow that admonition. We presume the jurors were sincere and followed the admonition and that any prejudice was cured.

Ireland has not shown this is an exceptional case in which an admonition would not cure any prejudice. He never disputed that he killed Yolanda and Michelle: He claimed self-defense and asserted he was guilty at most of manslaughter. Evidence of the contents of the closed container, if perceived as character evidence, showed Ireland might have been interested in picking locks, not killing people. Ireland's counsel elicited testimony that there were no allegations of lock picking, theft, or prowling against Ireland and that the book on lock picking had no evidentiary value. Further, evidence of the contents of the container was not ""sufficiently material to provide the basis for conviction"" and therefore its erroneous admission did not violate due process. (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1026.)

IV.  *No Cumulative Error*

Ireland asserts cumulative error.  As we have concluded there was no error, "[t]here was . . . no error to cumulate."  (*People v. Phillips* (2000) 22 Cal.4th 226, 244.)


DISPOSITION

The judgment is affirmed.



SANCHEZ, J.

WE CONCUR:



MOORE, ACTING P. J.



MOTOIKE, J.